UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| United States of America,<br><br>                  Plaintiff,<br><br>v.<br><br>Francoise Ngele Bundu,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)  CRIMINAL<br>)  NO.  05-01076-JGD<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS FOR VIOLATION OF THE SPEEDY TRIAL ACT**

Defendant Francoise Ngele Bundu submits this memorandum of law in support of her Motion to Dismiss for Violation of the Speedy Trial Act.

## INTRODUCTION

On March 16, 2005, the government filed a Complaint against Francoise Bundu, alleging that, on January 15, 2004, Ms. Bundu unlawfully removed her children from the United States with intent to obstruct the lawful exercise of parental rights in violation of 18 U.S.C. §1204. Ms. Bundu was arrested on this charge on April 5, 2005. It is now 20 months after the date of arrest, and the government has neither indicted the case nor dismissed the charges against Ms. Bundu. Even taking into account excludable time, the government has far exceeded the time period for indictment required by 18 U.S.C. §3161(b).

Ms. Bundu agreed to extensions of time under the Speedy Trial Act through March 2006 in connection with her counsel's presentation of evidence of domestic violence. That evidence was submitted to persuade the government not to indict. Under the kidnapping statute, the fact that the defendant fled or stayed away from a pattern of domestic violence would constitute a

defense to the charge.  The evidence that defense counsel submitted to the government would establish that defense for Ms. Bundu.

For the period May 2005 through March 2006, Ms. Bundu agreed to extensions under the Speedy Trial Act.  These efforts continued after new counsel entered an appearance on her behalf in March 2006.  New counsel met with the government in May 2006 and submitted a detailed letter memorandum to the prosecutor on June 1, 2006.  During the meeting and in the letter, Ms. Bundu, through counsel, explained the factual circumstances that demonstrated that she had fled a pattern of domestic violence inflicted by her husband when she departed the United States in February 2004, which departure and subsequent failure to return for a period of time formed the predicate for her arrest.  In the meeting with government counsel and in the letter provided to the government, defense counsel explained the relevant facts and the defense view that, because those facts established a pattern of domestic violence that would constitute an absolute defense at trial, the government should not indict Ms. Bundu.

The government has not sought an extension of time under the Speedy Trial Act since March 2006.  After meeting with government counsel in May 2006 and sending a letter in June, the undersigned counsel has made a number of unsuccessful attempts over a period of more than two months to contact the government in order to obtain a determination as to whether the government intends to indict or dismiss the case, as well as to discuss the hardship that this matter is causing Ms. Bundu.  Originally, Ms. Bundu would have agreed back in May to reasonable extensions of time under the Speedy Trial Act in order to give the government time to consider the proffers and evidence of domestic violence that Ms. Bundu had submitted. However, Ms. Bundu now moves to dismiss the Complaint against her with prejudice due to the unreasonably long period of time that has now elapsed, the failure of the government timely to seek extensions, the government's failure even to respond to numerous telephone calls and additional letters from defense counsel, and the significant past and continuing hardship and prejudice this matter has caused.

## PROCEDURAL FACTS[1]

1.      The government filed a Complaint against Francoise Bundu on March 16, 2005, charging her with international parental kidnapping.   Tab 1 (Docket 05-mj-01076-JGD), Document No. 1.

2.      Ms. Bundu was arrested on April 5, 2005.  *Id.*, 4/5/05 Docket Entry.

3.      Ms. Bundu was held in a federal detention center until April 13, 2005.

4.      On April 13, 2005, Ms. Bundu made her initial appearance before the Court; she was held in further detention until her probable cause hearing.  *Id.*, 4/13/05 Docket Entry.

5.      The Court found probable cause on April 26, 2005.  *Id.*, 4/26/05 Docket Entry.

6.      On May 3, 2005, after 30 days in detention, Ms. Bundu was released into the custody of Ms. Prudence Kashala of Westborough, Massachusetts, where she was confined to home detention under electronic monitoring by pretrial services.  She was also required to report to Pretrial Services as directed, execute a $25,000 bond, and surrender her passport.  *See* Tab 3.

7.      On May 26, 2005, pursuant to an assented-to motion by the government to exclude time, the Hon. Judge Joseph L. Tauro entered an order excluding time from May 23, 2005 until June 27, 2005.  *See* Tab 1, 5/26/05 Docket Entry.

8.      On June 2, 2005, the Court modified the conditions of Ms. Bundu's release to allow her 2 hours per week of supervised visitation with her children.  Tab 1, 6/2/05 Docket Entry; 5/31/05 Docket Entry, Document No. 4.

9.      On June 17, 2005, the Court clarified the terms of Ms. Bundu's release.  The order required her to remain under electronic monitoring by pretrial services, but allowed Ms. Bundu to leave her residence without an escort if given prior approval by pretrial services.  Tab 1, 6/17/05 Docket Entry.  This was done to accommodate Ms. Bundu's obligations in the child custody case then pending in Middlesex Probate and Family Court.

---

[1] A true and correct copy of this Court's docket, 05-mj-01076-JGD, is attached as Tab 1; a true and correct copy of docket 05-mc-10209-JLT is attached as Tab 2.

10.    On July 13, 2005, the Court further modified the conditions of Ms. Bundu's release, allowing her to move to Woburn, Massachusetts.  All other conditions of release, including home detention and electronic monitoring, remained in place.  Tab 1, 7/13/05 Docket Entry, Document No. 6.

11.    On August 1, 2005, pursuant to an assented-to motion by the government to exclude time, Judge Tauro entered an order excluding time from June 29, 2005 until August 25, 2005.  Tab 2 (Docket 05-mc-10209-JLT), 8/1/05 Docket Entry.

12.    On September 20, 2005, pursuant to an assented-to motion by the government to exclude time filed, Judge Tauro entered an order excluding time from August 25, 2005 until September 29, 2005.  *See* Tab 1, 9/20/05 Docket Entry.

13.    On October 3, 2005, pursuant to an assented-to motion by the government to exclude time, Judge Tauro entered an order excluding time from September 29, 2005 until October 13, 2005.  *See id.*, 10/3/05 Docket Entry.

14.    On October 6, 2005, the Court modified Ms. Bundu's conditions of release to permit her to leave her home daily from 6:00 a.m. to 8:00 p.m. upon notice to her pretrial services officer.  This change acknowledged the change in circumstances effected by a temporary order of the probate court, which gave Ms. Bundu custody of her children from Monday through Friday.  *Id.*, 10/6/05 Docket Entry, Document No. 8.

15.    On November 15, 2005, pursuant to an assented-to motion by the government to exclude time, Judge Tauro entered an order excluding time from November 15, 2005 until December 1, 2005.  *See id.*, 11/15/05 Docket Entry.

16.    On January 4, 2006, pursuant to an assented-to motion by the government to exclude time, Judge Tauro entered an order excluding time from December 14, 2005 until January 12, 2006.  *See id.*, 1/4/06 Docket Entry.

17.    On February 15, 2006, the government filed an assented-to motion to exclude time from January 12, 2006 through March 8, 2006.  Tab 2, 2/15/06 Docket Entry, Document No. 9.  This motion was granted on July 10, 2006.  *Id.*, 7/10/06 Docket Entry.

18.    On March 8, 2006, the government filed an assented-to motion to exclude time from March 8, 2006 through March 23, 2006. Tab 2, 3/8/06 Docket Entry, Document No. 10. This motion was granted on July 10, 2006. *Id.*, 7/10/06 Docket Entry; *see also* Tab 1, 7/10/06 Docket Entry.

19.    No further motions to exclude time have been filed to extend time under the Speedy Trial Act beyond March 23, 2006.

20.    On March 22, 2006, undersigned counsel entered an appearance for Ms. Bundu and her prior counsel withdrew. Tab 1, 3/22/06 Docket Entry.

21.    On April 28, 2006, over a year after the date of her arrest, the Court granted Ms. Bundu's unopposed motion to modify the conditions of her release. This order terminated Ms. Bundu's partial home detention and electronic monitoring. Ms. Bundu is still required to report twice weekly to pretrial services, once by telephone and once in person. Tab 1, 4/28/06 Docket Entry, Document No. 12.

22.    In May 2006, defense counsel met with the assigned Assistant United States Attorney ("AUSA") to urge the government not to indict based on certain facts identified during the investigation of this matter. At the government's request, Ms. Bundu's counsel provided government counsel with a detailed letter dated June 1, 2006, which set forth the factual basis that demonstrated the domestic violence affirmative defense that Ms. Bundu had to the international parental kidnapping statute. *See* Declaration of Andrew C. Phelan dated December 8, 2006 ("Phelan Decl."), submitted herewith, at ¶ 5.

23.    After sending the proffer letter to the AUSA on June 1, 2006, defense counsel left two voicemails for the AUSA in June. *See* Phelan Decl. ¶ 6.

24.    The AUSA returned defense counsel's call in June, stating that he had received the June 1 letter and had circulated it. *See* Phelan Decl. ¶ 7.

25.    After hearing nothing further, defense counsel left another three voicemails for the AUSA on July 11, July 24, and September 8, 2006. *See* Phelan Decl. ¶ 8.

26.    Defense counsel called the AUSA again, and was able to reach him, on September 12.  The AUSA stated that the government had not yet made a determination whether to indict.  *See* Phelan Decl. ¶ 9.

27.    Defense counsel left another three voicemails for government counsel on September 29, October 11 and October 16, 2006.  In the September 29 voicemail, defense counsel left a detailed message that sought closure with respect to the government's decision and noted that Ms. Bundu's ability to find a job was being hampered by the pendency of the kidnapping charge.  *See* Phelan Decl. ¶ 10.

28.    Receiving no response at all to those voicemails, defense counsel faxed a letter to the government on October 17, 2006, seeking resolution either by indictment or dismissal.  *See* Phelan Decl. ¶ 11.

29.    Receiving no response of any sort, defense counsel then mailed the October 17 letter to the government on October 26, 2006.  Defense counsel still received no response.  *See* Phelan Decl. ¶ 12.

30.    Defense counsel left a message for the government on November 18, 2006, and, to date, has not received any response.  *See* Phelan Decl. ¶ 13.

## DOMESTIC VIOLENCE FACTS

The international parental kidnapping statute, 18 U.S.C. § 1204(c)(2), states that "[i]t shall be an affirmative defense under this section that . . . the defendant was fleeing an incidence or pattern of domestic violence."  Regarding that defense, Ms. Bundu proffers the facts set forth in the letter memorandum she provided to government counsel, which is attached at Tab 4.  As explained below, these facts are relevant to Ms. Bundu's motion that the Complaint be dismissed with prejudice because they relate to the issue of the seriousness of the charge against her. Rather than restate those facts here, the letter is incorporated here by reference.  The letter was

provided to the government by undersigned counsel along with certain corroborating documents and points concerning the nature and manifestations of domestic violence.

In the attached letter, we have redacted the name of Ms. Bundu's husband, who is the complainant in connection with the kidnapping charge, because his name is not relevant to the instant motion and because Ms. Bundu seeks to move forward with her life without causing undue problems with her now ex-husband. This broken family has moved far beyond where they were eighteen months ago. It would not be in the best interests of that familial relationship needlessly to identify the former husband in this public filing. Ms. Bundu and her former husband share joint custody of their two children pursuant to a separation and custody agreement entered earlier this year in *Bundu v. Bundu*, 00D-1927-DV3 (Middlesex Probate and Family Court). Subsequent to her arrest, Ms. Bundu and her husband were divorced, settled their probate and custody matters, and have both moved on with their lives. Currently, Ms. Bundu has physical custody of the children Monday through Friday, and her ex-husband has custody from Friday to Monday. The twin children, who were 18 months old at the time of Ms. Bundu's arrest, are now 3 years old. Ms. Bundu had recently secured employment as a financial analyst, but she had to decline the position when she learned the schedule the company required would not permit her to meet her pretrial services reporting obligations associated with this matter.

## LEGAL ARGUMENT

### 1. The Government's Violation of the Speedy Trial Act Requires Mandatory Dismissal.

The Speedy Trial Act requires the government to charge an individual by indictment or information within thirty days of the date of arrest. 18 U.S.C. §3161(b) ("Any information or indictment charging an individual with the commission of an offense <u>shall</u> be filed within thirty days from the date on which the individual was arrested or served with a summons in connection

with such charges.") (emphasis added).  Failure of the government to do so, or to move for an

exclusion of time, requires dismissal of the charges against the defendant.  18 U.S.C. §3162(a)(1)

("If … no indictment or information is filed within the time limit required by section 3161(b) as

extended by section 3161(h) of this chapter, such charge against that individual contained in such

complaint <u>shall</u> be dismissed or otherwise dropped.") (emphasis added).

    As of the date of this motion, 260 days have passed since the government last made an

attempt to comply with 18 U.S.C. §§3161(b) and 3161(h).  This failure violates Section 3161(b)

of the Speedy Trial Act and requires dismissal under 18 U.S.C. §3162(a)(1).

<b>2.    The Court Should Dismiss This Case With Prejudice.</b>

    Although dismissal is mandatory upon a violation of the Speedy Trial Act, it is within the

Court's discretion to dismiss the case with or without prejudice.  "In determining whether to

dismiss the case with or without prejudice, the court <u>shall</u> consider, among others, each of the

following factors: the seriousness of the offense; the facts and circumstances of the case which

led to the dismissal; and the impact of reprosecution on the administration of this chapter and on

the administration of justice."  18 U.S.C. §3162(a)(1) (emphasis added).  Prejudice to the

defendant is also relevant.  *United States v. Taylor,* 487 U.S. 326, 334 (1988).  Each of these four

factors requires dismissing this case with prejudice.

<b>a.    The facts of this case and the government's dilatory actions demonstrate that the alleged offense is not serious and that it should be dismissed with prejudice.</b>

    Ms. Bundu was arrested for allegedly violating the international parental kidnapping

statute.  Although this can be a serious charge, its seriousness in this case is substantially

mitigated by two factors.  *See United States v. Peppin,* 365 F. Supp. 2d 261, 264 (N.D.N.Y.

2005) ("Any felony charge is serious.  But there are degrees of seriousness.")  First, Ms. Bundu

has an affirmative defense to this charge.  Second, the fact that the government has not taken any

action on this case evidences that the level of seriousness of the alleged offense is, at best, very

low.

This case arises from the removal of minor twin children Maya and Betoya Bundu by Ms. Bundu from the United States in January 2004. The removal of the children and their prolonged stay abroad was necessitated by the physically and emotionally controlling and abusive behavior of Ms. Bundu's former husband. That behavior is discussed in detail in the letter memorandum attached at Tab 4, and included physical violence beginning in 1999, throwing Ms. Bundu out of her apartment naked, physical abuse when Ms. Bundu was nine-months pregnant, and extremely controlling behavior. Even when Ms. Bundu finally obtained a restraining order, it was not enough to stop her husband's abuse. Her action in obtaining the restraining order prompted the most egregious effort at control by Ms. Bundu's husband, which was an attempt to separate Ms. Bundu from her children permanently by making false statements in an immigration filing as part of an effort to get Ms. Bundu deported. Even the restraining order was not enough to end the threat of physical violence against Ms. Bundu, as her husband shoved her and then threatened her and became involved in an altercation with her brother during his first visitation. Two days later, Ms. Bundu fled with the children and remained abroad for an extended period of time.

The international parental kidnapping statute establishes the fleeing of domestic violence as an affirmative defense to the charge. Ms. Bundu fled the country to escape the domestic violence that her husband began inflicting on her in 1999, and which continued through her pregnancy and birth of her children in late 2003, and through the date of her departure. The facts of her abuse mitigate the seriousness of the charge against her.

Furthermore, the government's substantial delays in prosecuting this case can only fairly be construed as an acknowledgement by the government that the specific facts of this case do not present a serious offense. *See United States v. Mancuso,* 302 F. Supp. 2d 23, 26 n.1 (E.D.N.Y. 2004) (dismissing indictment for felony with prejudice where plea negotiations call into question seriousness of charge). Had it been viewed as serious, it would have been prosecuted aggressively.

**b.    The administrative neglect that required the dismissal of this case favors dismissal with prejudice.**

When delay in indictment occurs, it is the government's burden to explain the circumstances leading to the delay and to justify that delay. *United States v. Miller,* 23 F.3d 194, 197 (8th Cir. 1994). Merely asserting that "the delay was [i]ndeliberate is not necessarily sufficient to excuse a violation of the [Speedy Trial] Act. *Id.* at 198 (dismissing with prejudice after delay in filing indictment) (citations omitted). Indeed, when a Speedy Trial Act violation "is caused by the court or the prosecutor, it weighs in favor of granting a dismissal with prejudice." *United States v. Ramirez,* 973 F.3d 36, 39 (1st Cir. 1992) (dismissing indictment with prejudice caused by court oversight). *See also Taylor,* 487 U.S. at 338 ("a truly neglectful attitude on the part of the Government reasonably could be factored against it").

Here, the "case was simply forgotten and delayed by precisely the sort of administrative neglect which the Speedy Trial Act was intended to discourage and sanction." *United States v. Angelini,* 553 F. Supp. 367, 369 (D. Mass. 1982) (dismissing charge with prejudice because of administrative neglect); *see United States v. Giambrone,* 920 F.2d 176181 (2d Cir. 1990) (dismissing indictment with prejudice where court found government's attitude toward Act "extremely lax" and where government made no effort to have time excluded as allowed by the Act); *United States v. Caparella,* 716 F.2d 976, 980 (2d Cir. 1983) (reversing dismissal without prejudice where "the record establishe[d] that the prosecutor's negligence was the sole cause of the failure to comply with the Act's time requirements").

The last of the government's consented-to motions for an extension of time extended the time to indict until March 23, 2006. As of the date of this filing, that date passed almost nine months ago. Upon obtaining new counsel on March 22, 2006, Ms. Bundu made renewed efforts to discuss her case with the government. Counsel for Ms. Bundu had at least one telephone conversation in April with government counsel, during which the government indicated that it was considering the role of domestic violence in this case and had not yet decided whether to

indict.  Government counsel agreed to meet with Ms. Bundu's counsel on May 18, 2006 to discuss the domestic violence defense further.

At that May 18 meeting, counsel for Ms. Bundu made a detailed presentation to the government, describing the domestic violence Ms. Bundu had suffered over the years at the hands of her husband.  At the end of the meeting, the prosecutor requested that Ms. Bundu provide a written statement setting forth the pattern of domestic violence from which Ms. Bundu fled in January 2004, so that the U.S. Attorney's office could consider the matter further. Counsel for Ms. Bundu did so on June 1, 2006.

Following the correspondence of June 1, 2006, defense counsel left at least eight voicemail messages for government counsel.  Defense counsel received one return call and was able to speak to the Assistant U.S. Attorney once in September 2006.  Although defense counsel was told a determination would be shortly forthcoming, that turned out not to be the case. Further, defense counsel has received no communication of any sort from government counsel despite repeated recent efforts to prompt a response through letters and telephone calls.  Finally, having received no response to several telephone calls, defense counsel faxed a letter to the AUSA on October 17, 2006, requesting resolution either by indictment or dismissal.  *See* Tab 5. Having received no response, on October 26, 2006, defense counsel had another copy of the October 17 letter mailed to the government.  Still receiving no response, defense counsel left a voicemail message for government counsel on November 18, 2006.  This call has gone unanswered.

This type of neglect by the government is precisely the sort of behavior sought to be eradicated by the Speedy Trial Act and warrants dismissal with prejudice.

> **c.    The impact of reprosecution of this case on the administration of the Speedy Trial Act also strongly warrants dismissal with prejudice.**

The First Circuit has "recognize[d] that whenever government—for whatever reason— falls short of meeting the Act's requirements, the administration of justice is adversely affected."

*Ramirez,* 973 F.2d at 39; *Caparella,* 716 F.2d at 981 ("we view a violation of any of the Act's time limitations as negatively impacting on the administration of the Act."). Here, the government's delay of seven months, combined with the failure of the government even to return the defense counsel's telephone calls or respond to correspondence, demonstrates a willfully negligent attitude toward the requirements of the Speedy Trial Act. In *Peppin* the Court stated:

> A fifteen month delay with no cognizable government activity between arrest and indictment is a classic example of a situation the Act was enacted to prevent. Overlooking, and thus to some extent condoning, this sort of neglectful, and rather cavalier, attitude towards the Speedy Trial clock would undermine the administration of the Act.

365 F. Supp. 2d at 266. That reasoning applies with equal force here.

### d.    Ms. Bundu Has Suffered Substantial Prejudice.

The United States Supreme Court has noted that the extend of the prejudice to the defendant is closely related to the length of the delay: "The longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on [her] liberty." *Taylor,* 487 U.S. at 340. Here, Ms. Bundu has been prejudiced by the significant delay, which includes her ability to locate corroborating witnesses.[2]

Further, and of particular significance here, Ms. Bundu has been prejudiced by her treatment at the hands of the criminal justice system. Although she has no criminal record whatsoever, she has been treated very poorly by the government. In connection with the pending complaint, Ms. Bundu has not even been indicted, yet: (1) she was held in jail for thirty days after her arrest; (2) she was subjected to home detention and required to wear an ankle bracelet in order to be subjected to electronic surveillance for over a year; and (3) for the past six months, she has been subject to continued pretrial supervision that includes two weekly reporting requirements to pretrial services, including one in person. The unwarranted shame, anxiety, and hardship to which Ms. Bundu has been subjected due to the prolonged government inaction

---

[2] For example, Ms. Bundu has been unable to locate the woman/witness who rescued her from one of her ex-husband's violent assaults on her in their apartment.

warrants dismissal with prejudice. Ms. Bundu has suffered and has been punished enough, even though she has never been formally charged, much less convicted.[3]

It has been more than seven months since the government has taken any action in this case. In the meantime, Ms. Bundu efforts to move on with her life have been hindered by the heavy weight of a threatened felony indictment hanging over her. She has obtained shared custody of her two children through the state court system, but suffers daily the anxiety from the prospect of losing her children as a result of a possible indictment, trial, and conviction. *See Taylor*, 487 U.S. at 340 (noting that inordinate delay can cause prejudice by creating anxiety in a defendant, his family, and his friends).

She has been substantially prejudiced in her ability to find work commensurate with her college education. The child support she receives from her ex-husband and the financial assistance she has been receiving from family is not enough to provide for her welfare or that of her children. For months, however, she sought only clerical jobs rather than professional jobs for which she was qualified because she did not want to risk being denied professional jobs due to the fact that potential criminal charges were pending against her that she would have to disclose. Instead, she sought to wait to apply for those until the kidnapping charge was resolved. However, more recently, because of financial need, she sought and obtained an offer of employment in a professional capacity as a financial analyst. She had to turn it down, however, because the hours would not have permitted her to fulfill her obligation to report to pretrial services in person once a week.

## CONCLUSION

This case has been pending now for twenty months. It is time to put an end to the ordeal that has been imposed on Ms. Bundu for far too long. Based on the government's undisputed

---

[3] It is not even necessary to show prejudice to the defendant in order to obtain dismissal with prejudice. *See United States v. Pena*, 73 F. Supp. 2d 56, 60 (D. Mass. 1999) (dismissing complaint with prejudice despite no finding of actual prejudice to defendant). Here, however, the prejudice suffered by Ms. Bundu is an aggravating additional factor that warrants dismissal of the Complaint with prejudice.

violation of the requirements of the Speedy Trial Act, the government's inexplicable delays and unresponsiveness to the defendant's repeated inquiries, the mitigating factors associated with Ms. Bundu's domestic violence defense to the threatened kidnapping charges, and the prejudice that Ms. Bundu has already suffered, the Court should dismiss the Complaint with prejudice.

Francoise Ngele Bundu,

By her attorney,

/s/ Andrew C. Phelan
Andrew C. Phelan, BBO #643160
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: December 8, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 8, 2006.

/s/ Andrew C. Phelan
Andrew C. Phelan

**TAB 1**

VICTIM

# United States District Court
## District of Massachusetts (Boston)
### CRIMINAL DOCKET FOR CASE #: 1:05-mj-01076-JGD-ALL

---

Case title: USA v. Bundu                     Date Filed: 03/16/2005

---

Assigned to: Magistrate Judge Judith G.
Dein

**Defendant**

**Francoise Ngele Bundu** (1)          represented by     **Andrew C. Phelan**
                                                          Bingham McCutchen LLP
                                                          150 Federal Street
                                                          Boston, MA 02110
                                                          617-951-8000
                                                          Fax: 617-951-8736
                                                          Email: andrew.phelan@bingham.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

                                                          **John P. Puleo**
                                                          Hassan & Reardon, P.C.
                                                          The Prudential Center
                                                          800 Boylston Street
                                                          P.O. Box 990069
                                                          Boston, MA 02199
                                                          617-859-3600
                                                          Fax: 617-859-3601
                                                          Email: jpuleo@hassanreardon.com
                                                          *TERMINATED: 03/28/2006*
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

**Pending Counts**                               **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                            **Disposition**

None

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1204.F-INTERNATIONAL PARENTAL KIDNAPPING | |

**Plaintiff**

| | | |
| --- | --- | --- |
| USA | represented by | **Donald L. Cabell** United States Attorney's Office Suite 9200 1 Courthouse Way Boston, MA 02210 617-748-3105 Fax: 617-748-3951 Email: donald.cabell@usdoj.gov *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
| --- | --- | --- |
| 03/16/2005 | 1 | COMPLAINT as to Francoise Ngele Bundu (1). (Simeone, Maria) (Entered: 03/21/2005) |
| 04/05/2005 | | Arrest of Francoise Ngele Bundu in Eastern District of New York. (Filo, Jennifer) (Entered: 04/19/2005) |
| 04/08/2005 | 3 | Rule 5(c)(3) Documents Received as to Francoise Ngele Bundu (Filo, Jennifer) (Entered: 04/19/2005) |
| 04/13/2005 | | Electronic Clerk's Notes for proceedings held before Judge Judith G. Dein :Initial Appearance as to Francoise Ngele Bundu held on 4/13/2005; AUSA Capin and Attorney Puleo for the dft.; USMJ Dein informs the dft. of her rights and charges; Govt. moves for detention and continuance; Dft. agrees to detention PC hearing on 4/25/05 @ 11:00am. USMJ Dein order the dft. to temporary detention pending hearing on 4/25/05. (Court Reporter D.R..) (Quinn, Thomas) (Entered: 04/14/2005) |
| 04/13/2005 | | Attorney update in case as to Francoise Ngele Bundu. Attorney John P Puleo for Francoise Ngele Bundu added. (Quinn, Thomas) (Entered: 04/14/2005) |
| 04/25/2005 | | Electronic Clerk's Notes for proceedings held before Judge Judith G. Dein :Detention Hearing as to Francoise Ngele Bundu held on 4/25/2005, Preliminary Examination as to Francoise Ngele Bundu held on 4/25/2005; AUSA Cabell and Attorney Puleo for the dft.; Govt. calls witess #1(Agent Harty) direct exam; exhibits 1-5 admitted; cross exam; |

| | | |
|---|---|---|
| | | court recesses for today and continues hearing for 4/26/05 @ 11:00am. (Court Reporter D.R..) (Quinn, Thomas) (Entered: 04/27/2005) |
| 04/26/2005 | | Electronic Clerk's Notes for proceedings held before Judge Judith G. Dein :Detention Hearing and Preliminary Examination as to Francoise Ngele Bundu held on 4/26/2005; AUSA Cabell and Attorney Puleo for the dft.; hearings continued from 4/25/05; USMJ Dein hears arguments on probable cause and finds probable cause; USMJ Dein hears arguments on detention and continues hearing until 4/27/05 @ 11:00am. (Court Reporter D.R..) (Quinn, Thomas) (Entered: 04/27/2005) |
| 04/27/2005 | | Electronic Clerk's Notes for proceedings held before Judge Judith G. Dein :Detention Hearing as to Francoise Ngele Bundu held on 4/27/2005; AUSA Cabell and Attorney Puleo for the dft.; USMJ Dein sets conditions of release; the dft will be released when conditions are met. (Court Reporter D.R..) (Quinn, Thomas) (Entered: 04/27/2005) |
| 05/26/2005 | | Judge Joseph L. Tauro : Electronic ORDER entered. ORDER ON EXCLUDABLE DELAY as to Francoise Ngele Bundu. Time excluded from May 23, 2005 until June 27, 2005, Pursuant to allowance of Assented to Motion to Exclude Time in MBD No. 05-10209. (Cummings, Mary) (Entered: 05/26/2005) |
| 05/31/2005 | 4 | MOTION to Modify Conditions of Release as to Francoise Ngele Bundu. (Quinn, Thomas) (Entered: 06/01/2005) |
| 06/02/2005 | | Judge Judith G. Dein : Electronic ORDER entered granting 4 Motion to Modify Conditions of Release as to Francoise Ngele Bundu (1) (Quinn, Thomas) (Entered: 06/02/2005) |
| 06/08/2005 | 5 | MOTION for Clarification *of conditions of release* as to Francoise Ngele Bunduby USA. (Cabell, Donald) (Entered: 06/08/2005) |
| 06/17/2005 | | Judge Judith G. Dein : Electronic ORDER entered granting in part and denying in part 5 Motion for Clarification as to Francoise Ngele Bundu (1)Defendant is to attend her deposition(s) as scheduled in the Middlesex Probate Court matter. In accordance with the agreement of the parties, the defendant does not need to be escorted when she leaves her current residence with Pre-Trial Services prior approval. Defendant shall otherwise remain on electronic monitoring at her current residence until further order of the court. (Dein, Judith) (Entered: 06/17/2005) |
| 07/12/2005 | 6 | MOTION to Modify Conditions of Release as to Francoise Ngele Bundu. (Quinn, Thomas) (Entered: 07/13/2005) |
| 07/13/2005 | | Judge Judith G. Dein : Electronic ORDER entered granting 6 Motion to Modify Conditions of Release as to Francoise Ngele Bundu (1) (Quinn, Thomas) (Entered: 07/13/2005) |
| 09/20/2005 | 7 | Judge Joseph L. Tauro : ElectronicORDER entered. ORDER ON EXCLUDABLE DELAY as to Francoise Ngele Bundu. Time excluded from August 25, 2005 until September 29, 2005, pursuant to allowance of motion filed in MBD 05-10209. (Cummings, Mary) (Entered: |

| | | 09/23/2005) |
|---|---|---|
| 10/03/2005 | 9 | Judge Joseph L. Tauro : ElectronicORDER entered. ORDER ON EXCLUDABLE DELAY as to Francoise Ngele Bundu Time excluded from September 29, 2005 until October 13, 2005 pursuant to allowance of motion filed in MBD 05-10209. (Cummings, Mary) (Entered: 10/06/2005) |
| 10/06/2005 | 8 | MOTION to Modify Conditions of Release as to Francoise Ngele Bundu. (Quinn, Thomas) (Entered: 10/06/2005) |
| 10/06/2005 | | Judge Judith G. Dein : ElectronicORDER entered granting 8 Motion to Modify Conditions of Release as to Francoise Ngele Bundu (1) (Quinn, Thomas) (Entered: 10/06/2005) |
| 11/15/2005 | | Judge Joseph L. Tauro : Electronic ORDER entered. ORDER ON EXCLUDABLE DELAY as to Francoise Ngele Bundu Time excluded from November 15, 2005 until December 1, 2005 pursuant to allowance of motion filed in MBD 05-10209. (Cummings, Mary) (Entered: 11/16/2005) |
| 01/04/2006 | | Judge Joseph L. Tauro : Electronic ORDER entered. ORDER ON EXCLUDABLE DELAY as to Francoise Ngele Bundu Time excluded from 12/14/05 until 12/21/05. Time excluded from 12/21/05 until 1/12/06. See motions 7 and 8 filed and allowed in MBD 05-10209-JLT (Hurley, Virginia) (Entered: 01/05/2006) |
| 03/22/2006 | 10 | NOTICE OF ATTORNEY APPEARANCE: Andrew C. Phelan appearing for Francoise Ngele Bundu (Phelan, Andrew) (Entered: 03/22/2006) |
| 03/22/2006 | | Attorney update in case as to Francoise Ngele Bundu. Attorney Andrew C. Phelan for Francoise Ngele Bundu added. (Quinn, Thomas) (Entered: 03/29/2006) |
| 03/28/2006 | 11 | NOTICE of Withdrawal of Appearance in case as to Francoise Ngele Bundu. Attorney John P. Puleo terminated. (Quinn, Thomas) (Entered: 03/29/2006) |
| 04/26/2006 | 12 | MOTION to Modify Conditions of Release as to Francoise Ngele Bundu. (Deluhery, Megan) (Entered: 04/26/2006) |
| 04/28/2006 | | Judge Judith G. Dein : Electronic ORDER entered granting 12 Motion to Modify Conditions of Release as to Francoise Ngele Bundu (1) (Quinn, Thomas) (Entered: 05/02/2006) |
| 07/10/2006 | | Judge Joseph L. Tauro : Electronic ORDER entered. ORDER ON EXCLUDABLE DELAY, pursuant to allowance of Motion to Exclude Time filed in MBD No. 05-mc-10209 JLT as to Francoise Ngele Bundu. Time excluded from January 12, 2006 until March 8, 2006. (Abaid, Kim) (Entered: 07/11/2006) |
| 07/10/2006 | | Judge Joseph L. Tauro : Electronic ORDER entered. ORDER ON EXCLUDABLE DELAY, pursuant to allowance of motion filed in MBD |

| | | No. 05-mc-10209 JLT as to Francoise Ngele Bundu. Time excluded from March 8, 2006 until March 23, 2006. (Abaid, Kim) (Entered: 07/11/2006) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/08/2006 15:39:25 | | | |
| PACER Login: | bd0037 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:05-mj-01076-JGD |
| Billable Pages: | 3 | Cost: | 0.24 |

**TAB 2**

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:05-mc-10209-JLT

United States of America v. Bundu                    Date Filed: 05/26/2005
Assigned to: Judge Joseph L. Tauro

**Plaintiff**

**United States of America**          represented by  **Donald L. Cabell**
                                                      United States Attorney's Office
                                                      Suite 9200
                                                      1 Courthouse Way
                                                      Boston, MA 02210
                                                      617-748-3105
                                                      Fax: 617-748-3951
                                                      Email: donald.cabell@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Francoise Ngele Bundu**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/26/2005 | 1 | Assented to MOTION for Excludable Delay from May 23, 2005 to June 27, 2005 by United States of America.(Cummings, Mary) (Entered: 05/26/2005) |
| 05/26/2005 | | Judge Joseph L. Tauro : EndorsedORDER entered granting 1 Assented Motion for Excludable Delay (Cummings, Mary) (Entered: 05/26/2005) |
| 06/20/2005 | 2 | Assented to MOTION for Excludable Delay to 6/27/2005 to 7/28/2005 by United States of America.(Cabell, Donald) (Entered: 06/20/2005) |
| 07/27/2005 | 3 | Assented to MOTION for Excludable Delay to 7/29/05 to 8/25/05 by United States of America.(Cabell, Donald) (Entered: 07/27/2005) |
| 08/01/2005 | | Judge Joseph L. Tauro : ENDORSEMENT ON MOTIONORDER entered granting 3 Motion for Excludable Delay (Smith3, Dianne) (Entered: 08/02/2005) |
| 08/24/2005 | 4 | Assented to MOTION for Excludable Delay from 8/25/05 to 9/29/05 by United States of America.(Cabell, Donald) (Entered: 08/24/2005) |
| 09/20/2005 | | Judge Joseph L. Tauro : ElectronicORDER entered granting 4 Motion for Excludable Delay from August 25, 2005 to September 29, 2005. (Cummings, Mary) (Entered: 09/23/2005) |

| | | |
|---|---|---|
| 09/28/2005 | 5 | Assented to MOTION for Excludable Delay by United States of America.(Cabell, Donald) (Entered: 09/28/2005) |
| 10/03/2005 | | Judge Joseph L. Tauro : EndorsedORDER entered granting 5 Motion for Excludable Delay to October 13, 2005 (Cummings, Mary) (Entered: 10/06/2005) |
| 11/10/2005 | 6 | Assented to MOTION for Excludable Delay by United States of America.(Cabell, Donald) (Entered: 11/10/2005) |
| 11/15/2005 | | Judge Joseph L. Tauro : Electronic ORDER entered granting 6 Motion for Excludable Delay. Time excluded to December 1, 2005 in which time Indictment need be obtained. (Cummings, Mary) (Entered: 11/16/2005) |
| 12/14/2005 | 7 | MOTION for Excludable Delay by United States of America.(Cabell, Donald) (Entered: 12/14/2005) |
| 12/21/2005 | 8 | Assented to MOTION for Excludable Delay by United States of America.(Cabell, Donald) (Entered: 12/21/2005) |
| 01/04/2006 | | Judge Joseph L. Tauro : Electronic ORDER entered granting 8 Motion for Excludable Delay from 12/21/05 to 1/12/06 (Hurley, Virginia) (Entered: 01/05/2006) |
| 01/04/2006 | | Judge Joseph L. Tauro : Electronic ORDER entered granting 7 Motion for Excludable Delay from 12/14/05 to 12/21/05. (Hurley, Virginia) (Entered: 01/05/2006) |
| 02/15/2006 | 9 | MOTION for Excludable Delay by United States of America.(Cabell, Donald) (Entered: 02/15/2006) |
| 03/08/2006 | 10 | Assented to MOTION for Excludable Delay by United States of America.(Cabell, Donald) (Entered: 03/08/2006) |
| 07/10/2006 | | Judge Joseph L. Tauro : Electronic ORDER entered granting 9 Motion for Excludable Delay, granting 10 Motion for Excludable Delay (Abaid, Kim) (Entered: 07/11/2006) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 12/08/2006 15:38:51 | | |
| PACER Login: | bd0037 | Client Code: |
| Description: | Docket Report | Search Criteria: | 1:05-mc-10209-JLT |
| Billable Pages: | 1 | Cost: | 0.08 |

**TAB 3**

AO A    (Rev. 6/97) Order Setting Conditions of Release                                    Page 1 of _3_ Pages

# UNITED STATES DISTRICT COURT

**District of** _Massachusetts_

United States of America

V.

_FRANCOISE Bundu_
### Defendant

**ORDER SETTING CONDITIONS**
**OF RELEASE**

Case Number: _05m - 1076 - JGD_

IT IS ORDERED that the release of the defendant is subject to the following conditions:

✓ (1)  The defendant shall not commit any offense in violation of federal, state or local law while on release in this case.

✓ (2)  The defendant shall immediately advise the court, defense counsel and the U.S. attorney in writing before any change in address and telephone number.

✓ (3)  The defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as directed. The defendant shall appear at (if blank, to be notified) _____

_____ on _____

Place

Date and Time

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be released provided that:

( ✔ ) (4)  The defendant promises to appear at all proceedings as required and to surrender for service of any sentence imposed.

( ) (5)  The defendant executes an unsecured bond binding the defendant to pay the United States the sum of _____ dollars ($ _____ ) in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL   SERVICES   U.S. ATTORNEY   U.S. MARSHAL

AO 199B    (Rev. 5/99) Additional Conditions of Release        Page _2_ of _3_

## Additional Conditions of Release

Upon finding that release by one of the above methods will not by itself reasonably assure the appearance of the defendant and the safety of other persons and the community.

IT IS FURTHER ORDERED that the release of the defendant is subject to the conditions marked below:

( ✓ ) (6)  The defendant is placed in the custody of:

(Name of person or    *Prudence  Kashala*

(Address)    *40 Upton Rd*

(City and state)  *Westboro MA*    (Tel. No.)  *508 - 870 - 5814*

who agrees (a) to supervise the defendant in accordance with all the conditions of release, (b) to use every effort to assure the appearance of the defendant at all scheduled court proceedings, and (c) to notify the court immediately in the event the defendant violates any conditions of release or disappears.

Signed: _____    *05-03-05*

                Custodian or Proxy                 Date

( ✓ ) (7)  The defendant shall:

( ✓ )(a)  report to the  *Pretrial Services as directed*

        telephone number        , not later

( ✓ )(b)  execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property  *a $25,000 x/100 Bond Secured by Cash Deposit with Clerks Office*

( )(c)  post with the court the following indicia of ownership of the above-described property, or the following amount or percentage of the above-described

( )(d)  execute a bail bond with solvent sureties in the amount  _____

( )(e)  maintain or actively seek employment

( )(f)  maintain or commence an education program

( ✓ )(g)  surrender any passport  *Pretrial*

( ✓ )(h)  obtain no passport

( ✓ )(i)  abide by the following restrictions on personal association, place of abode, or travel:  *Travel is restricted to District of MA reside at 40 Upton Road, Westborough, MA*

( )(j)  avoid all contact, directly or indirectly, with any persons who are or who may become a victim or potential witness in the subject investigation or prosecution, including but not limited

( )(k)  undergo medical or psychiatric treatment and/or remain in an institution as

( )(l)  return to custody each (week) day as of _____ o'clock after being released each (week) day as of _____ o'clock for employment, schooling, or the following limited

( )(m)  maintain residence at a halfway house or community corrections center, as deemed necessary by the pretrial services office or supervising officer.

( )(n)  refrain from possessing a firearm, destructive device, or other dangerous weapons.

( )(o)  refrain from ( ) any ( ) excessive use of alcohol.

( )(p)  refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

( )(q)  submit to any method of testing required by the pretrial services office or the supervising officer for determining whether the defendant is using a prohibited substance. Such methods may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing.

( )(r)  participate in a program of inpatient or outpatient substance abuse therapy and counseling if deemed advisable by the pretrial services or supervising officer.

( )(s)  refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or electronic monitoring which is (are) required as a condition(s) of release.

( ✓ )(t)  participates in one of the following home confinement program components and abide by all the requirements of the program ( ✓ )will or ( ) will not include electronic monitoring or other location verification system. You shall pay all or part of the cost of the program based upon your to pay as determined by the pretrial services office or supervising officer.

    ( ) (i) Curfew. You are restricted to your residence every day ( ) from _____ to _____ , or ( ) as directed by the pretrial services office or supervising officer; or

    ( ) (ii) Home Detention. You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the pretrial services office or supervising officer; or

    ( ✓ ) (iii) Home Incarceration. You are restricted to your residence at all times except for medical needs or treatment, religious services, and court appearances pre-approved by the pretrial services office or supervising officer.

( )(u)  report as soon as possible, to the pretrial services office or supervising officer any contact with any law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop.

( ✓ )(v)  *Defendant shall report to Middlesex Probate Court within 7 days of release from federal custody*

( ✓ )(w)  *Defendant must be escorted by 3rd Party Custodian, counsel or anyone approved by Pretrial Services, to Probate Court*

( )(x)  _____

DISTRIBUTION:  COURT    DEFENDANT    PRETRIAL SERVICES    U.S. ATTORNEY    U.S. MARSHAL

AO 199C    (Rev.6/97) Advise of Penalties . . .                                Page  _3_  of  _3_  Pages

## Advice of Penalties and Sanctions

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

A violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of release, an order of detention, and a prosecution for contempt of court and could result in a term of imprisonment, a fine, or both.

The commission of a Federal offense while on pretrial release will result in an additional sentence of a term of imprisonment of of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be in addition to any other sentence.

Federal law makes it a crime punishable by up to 10 years of imprisonment, and a $250,000 fine or both to obstruct a criminal investigation. It is a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to tamper with a witness, victim or informant; to retaliate or attempt to retaliate against a witness, victim or informant; or to intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If after release, you knowingly fail to appear as required by the conditions of release, or to surrender for the service of sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, you shall be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, you shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony, you shall be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor, you shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be in addition to the sentence for any other offense. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

## Acknowledgment of Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

_Françoise Pundy_
_____
Signature of Defendant

_40 Upton Road_
_____
Address

_Westborough, MA    508 870-584_
_____
City and State              Telephone

## Directions to United States Marshal

( ✓ ) The defendant is ORDERED released after processing.
(   ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the defendant has posted bond and/or complied with all other conditions for release. The defendant shall be produced before the appropriate judicial officer at the time and place specified, if still in custody.

Date: ____5/3/05____              _Thomas F. Quinn_
                                  _____
                                  Signature of Judicial Officer

                                  _Thomas F. Quinn_
                                  _____
                                  Name and Title of Judicial Officer

DISTRIBUTION:   COURT    DEFENDANT    PRETRIAL SERVICE    U.S. ATTORNEY    U.S. MARSHAL

**TAB 4**



Andrew C. Phelan
Direct Phone: (617) 951-8603
Direct Fax:    (617) 951-8736
andrew.phelan@bingham.com

June [1], 2006

**Via Hand Delivery**

Donald L. Cabell, Esq.
United States Attorney's Office
Suite 9200
1 Courthouse Way
Boston, MA 02210

Bingham McCutchen LLP

150 Federal Street

Boston, MA

02110-1726

617.951.8000

617.951.8736 fax

bingham.com

Boston

Hartford

London

Los Angeles

New York

Orange County

San Francisco

Silicon Valley

Tokyo

Walnut Creek

Washington

**Re:  United States v. Francoise Bundu, Case No. 1:05-mj-01076-JGD-ALL**

Dear Mr. Cabell:

Thank you for meeting with us to discuss this matter. As we discussed, this letter illustrates the pattern of domestic violence from which Francoise Bundu fled on January 16, 2004. Although ▬▬▬ had physically and emotionally abused Ms. Bundu since at least 1999, at your request, this letter focuses on the impact of the long-standing pattern of domestic violence in the final seven to eight weeks between when Ms. Bundu obtained a restraining order against ▬▬▬ and when she fled Massachusetts. As described more fully below, ▬▬▬'s actions during this time were entirely consistent with his past history of controlling, abusive, and violent behavior. As such, the domestic violence suffered by Ms. Bundu would establish an affirmative defense to the international parental kidnapping charges your office is considering.

As we discussed, those final weeks cannot be viewed in isolation. The law does not require Ms. Bundu to erase from memory her suffering at the hands of ▬▬▬ simply because she was able to in obtain a restraining order against him, and she understandably did not do so. The pattern of violence began shortly after the Bundus were married in 1999, and continued through the years, with recurring and violent physical attacks, verbal and emotional abuse, and controlling behavior. This pattern continued through Ms. Bundu's departure, despite the fact that Ms. Bundu had sought the help of the police, obtained a protective order, had some assistance of counsel and was seeking further relief from the judicial system.

It is a misconception that domestic violence is limited solely to violent physical abuse, although this type of abuse is present in this case. To the contrary, domestic violence encompasses a much broader range of behaviors as the abuser seeks to intimidate, control, demean, and isolate the victim — as recognized by the United States

\* H = Husband

Donald L. Cabell, Esq.
June [1], 2006
Page 2

Department of Justice.[1]  Indeed, a report published by the National Criminal Justice
Reference Service ("NCJRS") and sponsored by the Department of Justice, cautions
against too narrow a construction of domestic violence:

> [L]imit[ing] the definition of the term [intimate partner violence] to acts
> carried out with the intention of, or perceived intention of, causing
> physical pain or injury to another person . . . ignores the myriad
> behaviors that persons may use to control, intimidate, and otherwise
> dominate another person in the context of an intimate relationship.[2]

In this case, ██████████ inflicted on Francoise Bundu a series of abusive acts,
including violent physical attacks, intimidation, verbal abuse, emotional abuse, and
controlling and isolating behavior.  His actions constitute a pattern of domestic violence
intended to hurt, demean, control, intimidate, and isolate Francoise so that she would
remain vulnerable to him.  Consistent with this pattern, Francoise exhibited behavior
typical of an abused spouse: often leaving her home to get away from her abuser and only
returning because she had nowhere else to go.  Over time, she became more and more
intimidated and submissive, doing all she could to avoid arguments even in the face of
██████'s constant efforts to antagonize her.  His family even discouraged her from going
to the police, telling her that the police would only cause more problems.  Like many
victims of domestic violence, she hoped that he would change, especially after she
became pregnant with the twins.  But he did not change.  He abused her even during her
difficult pregnancy.

Domestic violence literature tells us that the period after a victim attempts to get
help is critical.  Not only can victims be lulled into a false sense of security that
significantly increases their susceptibility to serious physical harm, but "[s]ince domestic
violence is a pattern of power and control, when victims attempt to break free of this

Bingham McCutchen LLP
bingham.com

---

[1] Other branches of the federal government also recognize this fact.  For example,
immigration regulations concerning petitions made pursuant to the Violence Against
Women Act (VAWA) state that: "Acts that, in and of themselves, may not initially
appear violent may be part of an overall pattern of violence."  8 C.F.R. 216.5(e)(3)(i).  As
discussed below, Ms. Bundu filed a VAWA petition.

[2] "Extent, Nature and Consequences of Intimate Partner Violence" (July 2000), *available
at* www.ncjrs.gov/pdffiles1/nij/181867.pdf at 5.  *See* Tab A (relevant excerpts attached).

Donald L. Cabell, Esq.
June [1], 2006
Page 3

domination, many batterers are desperate to reassert control."[3]  This is precisely what Francoise experienced during those last few weeks.

Bingham McCutchen LLP
bingham.com

To understand Francoise's state of mind during this critical period, one must consider not only the past history of violence, but how desperate her situation had become.  Before her difficult pregnancy, Francoise had been able to escape the locus of the violence, their joint apartment, when she went to work, spent overnights at a hotel or friend's house, or spent a weekend away.  During her maternity leave, however, Francoise was caring for the twins at home on a full-time basis.  This circumstance eliminated the option of temporary escapes; Francoise was exposed all the time.  Except for the brief visit by her mother from abroad, Francoise was utterly alone here. ███ had made it impossible for Francoise to make and/or maintain friendships during their marriage.  Indeed, the Massachusetts Probate Court acknowledged this controlling and intimidating behavior of ███ when it rejected ███'s efforts to find suitable in-home assistance for Francoise, recognizing that the individuals ███ suggested were not people Francoise knew or could rely on, but were ███'s co-workers and acquaintances.  The Court, recognizing Francoise's isolation and her unacceptable situation of total dependence on her abuser, approved the stipulation that allowed her to leave the country so that her family could provide her the support she needed to recuperate from her caesarian section and care for the 10-week old twins.

Isolated, and with the urgent need to protect herself and her two children from a hostile home environment, Francoise obtained a restraining order against ███.  Benoit's reaction was that of a typical batterer: he struggled to regain control over Francoise through the following acts:

- ███ filed for his own 209A order the *day after* Francoise successfully obtained such an order for herself.[4]  This was obviously done in retaliation.

- ███ contacted Francoise through neighbors on two occasions (December 8 and 13), in an effort to coerce her to drop the restraining order and reconcile with him.  This was a violation of the restraining order.

---

[3] National Clearinghouse for the Defense of Battered Women, "The Impact of Parental Kidnapping Laws and Practice on Domestic Violence Survivors" (August 2005), *available at* http://www.vaw.umn.edu/documents/pkreport/ pkreport.html#id300200.

[4] In support of his petition, ███ falsely alleged that Francoise had harassed him at work on December 3, although she had been at court all day working to get a restraining order against him.

Donald L. Cabell, Esq.
June [1], 2006
Page 4

- ████ withdrew his support for Francoise's immigration petition the day after the restraining order against him was extended. This exposed Francoise to immediate deportation and potentially permanent separation from her children, Maya and Betoya.[5]

- ████ continued to isolate Francoise by opposing her requests to the court that she be permitted to visit her family abroad. Instead, ████ suggesting Francoise receive "assistance" at home from his own friends and co-workers.

- Even under the auspices of a temporary visitation order negotiated in court and approved by a judge that very day, ████ threatened and abused Francoise on January 14 during his very first visitation with the children. He also violated the stipulation by bringing unauthorized persons to the visit and locked Francoise out of the apartment.[6]

Even in isolation, these are serious incidents of domestic violence, not just acrimony over a deteriorating relationship. Given the pattern of abuse Francoise had been suffering for four years -- incidents of control and verbal abuse succeeded by serious physical violence -- the situation had become explosive. Not only was ████ undaunted by a court order, but he clearly would do whatever it took to regain control. This is demonstrated most acutely by his fraudulent withdrawal of support for Francoise's immigration petition, in connection with which ████ alleged that Francoise had only married him to secure her residency status. In his effort to reassert dominance and control over her, he sought to have her deported, without any regard for the interests of his children in having their mother be a part of their lives.

After ████ defied of both the restraining order and stipulation during the first visitation, Francoise realized she was still in danger. The next day, January 15, Francoise made an urgent call to her social worker, Alex Beck, and explained how poorly the visitation had gone, that she was afraid, and that she was packing to leave.

---

[5] "Battered immigrants who believe that their spouses control their immigration status may be afraid to leave for fear of being deported." ABA Commission on Domestic Violence. Indeed, once Francoise "left" by obtaining the restraining order, ████ acted on her fear and withdrew his support for her immigration petition.

[6] "Unless protective orders are enforced, they can prove harmful to victims by creating a false sense of security." U.S. Department of Justice, Office of Justice Programs, Office for Victims of Crime, "Enforcement of Protective Orders," Legal Series Bulletin #4 (January 2002), *available at* http://www.ojp.usdoj.gov/ovc/publications/bulletins/legalseries/bulletin4/ncj189190.pdf at 5.

Bingham McCutchen LLP
bingham.com

Donald L. Cabell, Esq.
June [1], 2006
Page 5

Ms. Beck's notes reflect the urgency of Francoise's departure:

> retd to court and judge gave her ok to leave country with babies BUT judge granted husb visitation rights too —problem at house yest— could not stay on phone with me—apparently packing—"we have to go". States she will get back to me or Biddy when she can. I enc her to continue to do what is necessary to stay safe, call police as needed.

Bingham McCutchen LLP

bingham.com

*See* Tab B (attached). Francoise bought a ticket to Belgium on Saturday, January 16 and left the same day. She left most of her clothing and numerous other possessions behind in the apartment that ████ continues to occupy.

To properly understand these last few weeks, it is necessary to consider the context of the pattern of behavior that preceded them. Although not all-inclusive, various incidents that comprise ████'s pattern of domestic violence, and Francoise's efforts to deal with this abuse, are addressed briefly below.

- In June 1999, just weeks after ████ and Francoise were married, ████ violently beat Francoise in front of his young daughter from his prior marriage. He treated Francoise like a child, ordered her to her bedroom and, when she refused, pushed and slapped her. In the bedroom, the assault continued as he threw her to the floor and beat her. For her own safety, Francoise left the apartment and spent the night at a hotel. *See* Binder, Tab 1 at 35:16-36:17.

- When they had problems conceiving, ████ and Francoise consulted a fertility doctor during a workday in December 1999. When the doctor discussed test results with them that suggested that ████ might be the cause of their fertility difficulties, ████ was infuriated. When ████ came home from work that evening, he immediately began yelling at her and refused her entreaties to talk about it after he had calmed down. Instead, ████ grabbed Francoise, dragged her from the kitchen to the living room, and threw her to the floor, causing her to hit her head. With shod feet, he kicked her in the ribs. He choked her. Fearing for her life, Francoise desperately screamed for help. A neighbor finally heard her screams and called a relative in the building who knew ████. ████ was still beating Francoise when a woman (Mary Woldemichael) came to the door. Mary told ████ that the only reason she did not call the police was because she knew him. *See* Binder, Tab 1 at 37:18-41:24; 43:23-44:3. To hide her injuries, which included a black eye, Francoise called in sick to Zoom Telephonics the next day. *See* Binder, Tab 1 at 42:15-21. Her work records confirm this. *See* Binder, Tab 2.

- Several months later, on a Sunday in March 2000, Francoise suggested to ████ that they return to the fertility doctor. ████ got upset and began yelling at Francoise and insulting her. Afraid of him, she left the house. She did not return until she knew he had left the apartment to take his daughter home to her mother's house in Rhode Island. When ████ returned that evening, he told

Donald L. Cabell, Esq.
June [1], 2006
Page 6

Bingham McCutchen LLP
bingham.com

Francoise she was not permitted in their "marital" bedroom, so Francoise was forced to sleep on the living room couch. Throughout the evening, he tried to start a further argument with her, but she ignored him in an attempt to avoid upsetting him because she feared his violent reaction.

The next morning, she waited until ████ was out of the apartment before she went into their bedroom to get her work clothes and get ready for work. Still afraid of ████, Francoise locked the bathroom door while she showered. ████ picked the bathroom lock and began yelling at her that she should leave *his* house. He shoved her — completely naked — out the apartment door and into the public hallway, and shut the door, leaving her out there. Francoise banged on the door and screamed for help. Eventually, ████ opened the door, grabbed Francoise, and pulled her back inside. As he was doing this, she fell and cut her leg, drawing blood.[7]

Throughout the rest of that week, ████ continued to torment Francoise. He took her underwear and threw it around the house. He left nasty notes for her. He left a juice glass in her underwear drawer. He left meat out on the coffee table. Intimidated by his violence, Francoise tried to avoid any confrontations. However, as the weekend approached, she found herself afraid to spend two days in the apartment with him. She found a cheap airfare to Las Vegas and stayed in a hotel room all weekend, sleeping and reading. *See* Binder, Tab 1 at 59:18-61:5. She returned on a red-eye flight on Monday morning so she could return directly to work. *See* Binder, Tab 5.[8]

- At 1 a.m. on June 11, 2000, Francoise reported an incident to the Cambridge Police that had occurred earlier that evening (June 10), during which ████ had called Francoise a "whore." *See* Binder, Tab 7. Around 11 p.m. that evening, after another argument, she called the police who were dispatched to the apartment. *See* Binder, Tab 8. Francoise, afraid to stay in the apartment with ████, went to stay with a friend, Marta Tangong. On June 21, 2000, Francoise

---

[7] ████ acknowledged that this incident occurred, but put his own incredible spin on it, namely, that, for some unexplained reason, Francoise went out into the hall naked of her own volition and that he calmly spoke with her and gently brought her back inside. *See* Binder, Tab 2 at 46:3-48:16.

[8] While she was away, ████ filed a missing person's report with the Cambridge Police Department in which, although he denied physical abuse, he admitted that Francoise had left the apartment to stay away from home several times that year. *See* Binder, Tab 6.

Donald L. Cabell, Esq.
June [1], 2006
Page 7

went to see a doctor for back pain and reported to her doctor that "[s]he has recently been going through some marital problems."[9]

- On December 30, 2000, Francoise and ████ had another argument. ████ slept in the second bedroom with his daughter that night. The next day, Francoise went into the bedroom alone to change. ████ opened the door to enter the room, and she closed it. He threatened her, "Don't you dare close this door!" She closed it and ignored him. He opened the door, came into the room and pushed her onto the bed. He kicked her. He fought with her; their struggles broke a lamp. He yelled at her. He kicked her in the ribs. He pulled her up by her hair and told her to leave the house. She went to speak to ████'s brother, Peter, who lived in the same apartment building. She told him what had happened, but Peter did not care. She then reported it to ████'s mother, who was visiting from the Congo. However, when they all returned to Francoise's apartment, no one mentioned the violence. Instead, they made Francoise feel like it was her fault, and they had her make dinner to apologize. They told her not to go to the police or social workers to make reports because they just divide families — better to keep it within the family. *See* Binder, Tab 1 at 190:10-193:17.

- Beginning in June 2003, Francoise was confined to bed rest for the remaining five months of her pregnancy. *See* Binder, Tab 1 at 65:5-9. She suffered some verbal abuse during this time. *See id.* at 66:11-13. One week before her due date, she, ████ and his daughter, A████, went out to buy Francoise shoes that would fit her swollen feet. ████ A████ was having difficulty operating the DVD player in the car, and ████ instructed Francoise to read her the manual. Francoise declined, saying she was exhausted. ████ got angry and yelled at her. He slapped her and shoved her head into the car window. Francoise was astonished that he would physically abuse her even while she was pregnant. She was afraid and opened the door to get away. She realized her situation, that she would be left to wander down the streets of Medford at night. With nowhere to go, Francoise gave in to ████'s efforts to get her back in the car and return home. *See* Binder, Tab 1 at 66:19-69:18.

- After their children were born, ████ unilaterally selected names for the twins other than those he and Francoise had previously agreed to. He called the children "test tube babies." *See* Binder, Tab 13 at ¶ 16. At home, ████ would rip the children from Francoise's arms without taking care to handle them gently or to prevent them from falling or being hurt during the transfer.

---

[9] *See* Tab C (attached).

Bingham McCutchen LLP
bingham.com

Donald L. Cabell, Esq.
June [1], 2006
Page 8

Bingham McCutchen LLP
bingham.com

- When Francoise's mother came to help with the babies, ▆▆▆ treated both her and Francoise with total disrespect. At one point, he even threw his mother-in-law's clothing into the hall, suggesting that she should leave. He also verbally abused Francoise during this time. *See* Binder, Tab 1 at 72:18-22.

- On December 2, 2003, Francoise called her midwife at Harvard Vanguard to discuss ▆▆▆'s behavior. The midwife referred Francoise to Alex Beck, a social worker with the hospital, who contacted Francoise. Francoise reported a long history of "very controlling behavior with verbal and physical abuse by husb[and], today feels unsafe for herself and 2 babies." *See* Tab D (attached). Later that evening, an argument with ▆▆▆ lead Francoise to call the police. ▆▆▆ agreed to leave the house. The police waited while he gathered some belongings. After ▆▆▆ had gone, Francoise realized that ▆▆▆ had taken her immigration papers, the couple's tax returns, and photos of Francoise while she was pregnant and of the twins.

- The next day, December 3, Francoise called Alex Beck to tell her she was going to get a restraining order and was at court all day. Without legal counsel, but with her mother and two infants, Francoise got a restraining order. On December 5, 2003, Francoise called Alex Beck to discuss the situation and told Ms. Beck that she was changing their locks. On December 8, 2003, Francoise had a post-partum check-up with her midwife. They discussed the past physical and verbal abuse Francoise had suffered. *See* Tab E (attached).

- Around December 8, after getting the restraining order and providing ▆▆▆ notice, ▆▆▆ had a woman in the building contact Francoise to persuade her to drop the restraining order and reconcile with him. A few days later, the woman returned to Francoise's apartment again, this time with her husband, to urge Francoise to drop the restraining order. ▆▆▆'s efforts, through neighbors, to coerce Francoise to drop the restraining order and take him back violated the no contact terms in the restraining order. To Francoise, it appeared she could not escape him, even with the order.

- On December 17, the parties appeared in court and agreed to continue the restraining order. Shortly thereafter, Francoise moved the court to permit her to travel to the Congo with her mother, whose U.S. visa was expiring, because Francoise was alone in this country and without help to care for her twin newborns. The court asked the parties to consider another means of providing support for Francoise.

- The next day, December 18, unknown to Francoise, ▆▆▆ withdrew his support for their joint petition for termination of Francoise's conditional residence status. *See* Binder, Tab 11. The withdrawal of his support had its desired effect; the joint petition was denied.

Donald L. Cabell, Esq.
June [1], 2006
Page 9

Bingham McCutchen LLP

bingham.com

- On January 8, 2004, ▓▓▓ filed for divorce. (▓▓▓ had also filed for divorce, without informing Francoise, in June 2000 while the couple was going through a particularly difficult period.) Francoise was never served with these divorce papers. She was not aware at the time that the papers had been filed. The complaint for divorce was later dismissed for failure to effect service.

- Approximately January 12, 2004, Francoise received the January 6 notice from the Department of Homeland Security indicating that her residency had been terminated and that she was "subject to immediate deportation." *See* Binder, Tab 11. The notice stated that ▓▓▓ had withdrawn his support for their joint petition, and that he indicated in a written statement that their marriage was based on lies and deceit and that Francoise had married him just to get her green card. The letter from Homeland Security strongly suggests that ▓▓▓ deliberately lied in what he said in his report to the immigration officials about their marriage.

- On January 14, 2004, the parties signed a stipulation that allowed ▓▓▓ to have daily visits with the twins until they left the country with Francoise. *See* Binder, Tab 12. That evening, ▓▓▓ arrived with his brother, another woman, and that woman's daughter. Francoise pointed out to ▓▓▓ that this woman and her child were not authorized to be present at the visits under the terms of the stipulation. ▓▓▓ argued with Francoise and pushed her against the wall, in violation of the restraining order. The other woman then left, although ▓▓▓ had asked her to remain.

  Because her brother had not yet arrived to supervise the visit as provided in the stipulation, Francoise remained in the bedroom. ▓▓▓ came to the bedroom, where he had earlier placed his coat, and threatened Francoise not to "dare" move his coat from the bed. When her brother arrived, Francoise left the apartment. When she returned at the end of the visitation, ▓▓▓ had locked the door to the apartment and she could not get in. The police arrived shortly thereafter, in response to ▓▓▓'s call.

- On January 15, Francoise telephoned her social worker to tell her what had happened the day before. On January 16, Francoise fled to Belgium with her children to escape ▓▓▓'s abuse.

Notably, most of the events described above occurred before ▓▓▓ filed for divorce, which he did only on January 8, 2004. All of them occurred before Francoise was aware that he had filed for divorce.

     \*     \*     \*

    As set forth above, the history of abuse that ▓▓▓ inflicted on Francoise reflects a clear pattern of domestic violence in several ways. First, it has been continuing for several years and consists of repeated behaviors that range from controlling behavior, to

Donald L. Cabell, Esq.
June [1], 2006
Page 10

verbal abuse, to violent physical abuse — all of which ▆▆▆▆ intended to intimidate and control Francoise and make her submissive to him. Second, the incidents reflect the following pattern of behavior: incidents of controlling and intimidating behavior and verbal abuse followed by severe incidents of physical violence. The controlling and intimidating behaviors include: monitoring Francoise while she went on routine personal appointments; demeaning and vulgar name-calling; heated verbal arguments that resulted in Francoise leaving and, in some instances, staying away from her home; and purposefully tormenting Francoise by creating messes in the apartment, scattering her underwear around the apartment, and leaving nasty notes for Francoise. The severe incidents of physical violence include: dragging Francoise around the apartment, throwing her on the floor, kicking her in the ribs and choking her; throwing Francoise naked into the hallway; pushing and kicking her and pulling her hair; and slapping her and shoving her head against the car window even when she was nine months pregnant and with a risky pregnancy that required her to be on bed rest for five months.[1] ▆▆▆▆'s behavior here fit the pattern of domestic violence recognized by NCJRS: "violence perpetrated against women by intimates is often part of a systematic pattern of dominance and control, or what some researchers have called 'patriarchal terrorism.'"[10] This is precisely what Francoise suffered. Even after Francoise sought court protection through a restraining order, ▆▆▆▆'s controlling, intimidating and violent behavior continued.

Given the pattern of controlling behaviors and incidents of verbal abuse leading inexorably to severe incidents of physical abuse, Francoise knew in January 2004 that the familiar pattern of escalating violence was back. And she knew by ▆▆▆▆'s actions in violation of the restraining order that that piece of paper could not protect her. Indeed, ▆▆▆▆'s behavior was what the National Coalition Against Domestic Violence ("NCADV") calls "tactics used to control immigrant victims of domestic violence", which include isolation, intimidation (described by NCADV as hiding or destroying immigration papers or other important documents for the victim and/or the children), and withdrawing papers supporting the victim's immigration status.[11] Francoise suffered each of these "tactics" even *after* she sought the protection of police and the courts, making them all the more frightening.[12]

---

[10] "Extent, Nature and Consequences of Intimate Partner Violence," *supra* note 2, at 34.

[11] NCADV, "Immigrant Victims of Domestic Violence", *available at* http://www.ncadv.org/files/ImmigrantVictims_.pdf at 2.

[12] Francoise's fears after seeking third-party intervention were acute. These fears were not unfounded, indeed, "[e]very year in the U.S. as many as 1600 women are *killed* by their intimate partner, most often after a history of violence and an attempt to leave the relationship." This is precisely the situation Francoise faced in December 2003-January 2004. Peter G. Jaffe and Claire V. Crooks, "Understanding Women's Experiences

(Footnote Continued on Next Page.)

Bingham McCutchen LLP
bingham.com

Donald L. Cabell, Esq.
June [1], 2006
Page 11

Furthermore, Francoise fled the country and ████'s violence only after trying numerous other interventions, all of which failed to protect her from the pattern of violence that she had suffered.[13] Her actions were consistent with patterns of domestic violence. Many battered women try to leave their batterers on numerous occasions before they are ultimately successful, if they succeed at all.[14] In this case, Francoise had temporarily fled and/or sought help on numerous occasions, a patterned response to domestic abuse that is consistent with current research on this issue. Francoise had (1) gone for a ride in a car with a neighbor, (2) stayed overnight at a hotel, (3) gone away for a weekend, (4) gone to the police, (5) stayed a night with a friend, (6) gone to ████'s family for help, (7) consulted a social worker, (8) gotten a TRO, and (9) secured the assistance of an attorney. None of these protected her from ████.

Bingham McCutchen LLP
bingham.com

Fleeing a pattern of domestic violence is a complete defense to an international parental kidnapping charge. The facts here demonstrate a clear pattern of domestic violence and a defense that, at a bare minimum, will provide a jury with a reasonable doubt as to whether Francoise is guilty of international parental kidnapping. Indeed, in our view the facts are even stronger than that. We appreciate your giving us the opportunity to present these facts to you for your consideration in advance of your making the final decision whether to indict Francoise. Based on these facts, we hope that your decision and the decision of your office is not to indict.

We also hope that your office considers the equitable reasons not to indict, including the fact that this family, albeit a divided one, very recently closed a gaping wound by agreeing to a court-approved resolution of custody and support issues. Francoise and ████ are parents to the two young children who have been at the epicenter of this dispute. They share legal custody and split time with the children

---

(Footnote continued from Previous Page.)

Parenting in the Context of Domestic Violence: Implications for Community and Court-Related Service Providers" (Feb. 2005), *available at* http://www.vaw.umn.edu/documents/commissioned/parentingindv/parentingindv.html (emphasis added) (authors commissioned by DOJ's Office on Violence Against Women).

[13] Not only had Francoise tried to get help or left temporarily on numerous other occasions, now she was concerned that her children would witness their father abuse, dominate, beat and potentially kill their mother. Such fear is not unfounded; a July 1994 survey found that 43,000 Massachusetts children are exposed to acts of domestic violence each year. Legal Series Bulletin #4, note 3 *supra*, at 3.

[14] *See, e.g.,* ABA Commission on Domestic Violence, Continuing Legal Education Teleconference, "Civil Legal Assistance for Battered Immigrants" (May 23, 2001), *available at* http://www.abanet.org/domviol/commonquestions.doc.

Donald L. Cabell, Esq.
June [1], 2006
Page 12

essentially 50/50. Because of the children, Francoise and ████ have unavoidably created a life-long relationship during which they will have to constantly interact as they raise their children. For the sake of the children, and for the sake of this family, which must move forward productively, we hope that your office makes the determination not to indict. Any other result will necessarily lead to a trial that pits one parent against the other, which can only harm the children and the family.

Bingham McCutchen LLP

bingham.com

        If we can provide any other information, or if you have any questions, please call me at (617) 951-8603.

                              Very truly yours,

                              Andrew Phelan/LEB

                              Andrew C. Phelan

cc:    Megan C. Deluhery ✓
       Cynthia M. Guizzetti

**TAB A**

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*



# *Extent, Nature, and Consequences of Intimate Partner Violence*

research report

## Findings From the National Violence Against Women Survey



**U.S. Department of Justice**
**Office of Justice Programs**
810 Seventh Street N.W.
Washington, DC 20531

**Janet Reno**
*Attorney General*

**Daniel Marcus**
*Acting Associate Attorney General*

**Mary Lou Leary**
*Acting Assistant Attorney General*

**Julie E. Samuels**
*Acting Director, National Institute of Justice*

| Office of Justice Programs | National Institute of Justice |
|---|---|
| World Wide Web Site | World Wide Web Site |
| *http://www.ojp.usdoj.gov* | *http://www.ojp.usdoj.gov/nij* |

# Extent, Nature, and Consequences of Intimate Partner Violence

Patricia Tjaden
Nancy Thoennes

## Findings From the National Violence Against Women Survey

July 2000
NCJ 181867





CENTERS FOR DISEASE CONTROL
AND PREVENTION

.

Julie E. Samuels
*Acting Director, National Institute of Justice*

Stephen B. Thacker
*Acting Director, National Center for Injury Prevention and Control*

This research was sponsored jointly by the National Institute of Justice and the Centers for Disease Control and Prevention under NIJ Grant # 93–IJ–CX–0012. The opinions and conclusions expressed in this document are solely those of the authors and do not necessarily reflect the views of the U.S. Department of Justice or the Centers for Disease Control and Prevention.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.*

# Executive Summary

This report presents findings from the National Violence Against Women (NVAW) Survey on the extent, nature, and consequences of intimate partner violence in the United States. The National Institute of Justice and the Centers for Disease Control and Prevention cosponsored the survey through a grant to the Center for Policy Research. The survey consists of telephone interviews with a nationally representative sample of 8,000 U.S. women and 8,000 U.S. men about their experiences as victims of various forms of violence, including intimate partner violence.

The survey compares intimate partner victimization rates among women and men, specific racial groups, Hispanics and non-Hispanics, and same-sex and opposite-sex cohabitants. It also examines risk factors associated with intimate partner violence, the rate of injury among rape and physical assault victims, injured victims' use of medical services, and victims' involvement with the justice system.

Analysis of the survey data produced the following results:

- Intimate partner violence is pervasive in U.S. society. Nearly 25 percent of surveyed women and 7.6 percent of surveyed men said they were raped and/or physically assaulted by a current or former spouse, cohabiting partner, or date at some time in their lifetime; 1.5 percent of surveyed women and 0.9 percent of surveyed men said they were raped and/or physically assaulted by a partner in the previous 12 months. According to these estimates, approximately 1.5 million women and 834,732 men are raped and/or physically assaulted by an intimate partner annually in the United States. Because many victims are

victimized more than once, the number of intimate partner victimizations exceeds the number of intimate partner victims annually. Thus, approximately 4.8 million intimate partner rapes and physical assaults are perpetrated against U.S. women annually, and approximately 2.9 million intimate partner physical assaults are committed against U.S. men annually. These findings suggest that intimate partner violence is a serious criminal justice and public health concern.

- Stalking by intimates is more prevalent than previously thought. Almost 5 percent of surveyed women and 0.6 percent of surveyed men reported being stalked by a current or former spouse, cohabiting partner, or date at some time in their lifetime; 0.5 percent of surveyed women and 0.2 percent of surveyed men reported being stalked by such a partner in the previous 12 months. According to these estimates, 503,485 women and 185,496 men are stalked by an intimate partner annually in the United States. These estimates exceed previous nonscientific "guesstimates" of stalking prevalence in the general population. These findings suggest that intimate partner stalking is a serious criminal justice problem, and States should continue to develop constitutionally sound and effective antistalking statutes and intervention strategies.

- Women experience more intimate partner violence than do men. The NVAW survey found that women are significantly more likely than men to report being victims of intimate partner violence whether it is rape, physical assault, or stalking and whether the timeframe is the person's lifetime or the

previous 12 months. These findings support data from the Bureau of Justice Statistics' National Crime Victimization Survey, which consistently show women are at significantly greater risk of intimate partner violence than are men. However, they contradict data from the National Family Violence Survey, which consistently show men and women are equally likely to be physically assaulted by an intimate partner. Studies are needed to determine how different survey methodologies affect women's and men's responses to questions about intimate partner violence.

- Rates of intimate partner violence vary significantly among women of diverse racial backgrounds. The survey found that Asian/Pacific Islander women and men tend to report lower rates of intimate partner violence than do women and men from other minority backgrounds, and African-American and American Indian/Alaska Native women and men report higher rates. However, differences among minority groups diminish when other sociodemographic and relationship variables are controlled. More research is needed to determine how much of the difference in intimate partner prevalence rates among women and men of different racial and ethnic backgrounds can be explained by the respondent's willingness to disclose intimate partner violence and how much by social, demographic, and environmental factors. Research is also needed to determine how prevalence rates vary among women and men of diverse American Indian/Alaska Native and Asian/Pacific Islander groups.

- Violence perpetrated against women by intimates is often accompanied by emotionally abusive and controlling behavior. The survey found that women whose partners were jealous, controlling, or verbally abusive were significantly more likely to report being raped, physically assaulted, and/or

stalked by their partners, even when other sociodemographic and relationship characteristics were controlled. Indeed, having a verbally abusive partner was the variable most likely to predict that a woman would be victimized by an intimate partner. These findings support the theory that violence perpetrated against women by intimates is often part of a systematic pattern of dominance and control.

- Women experience more chronic and injurious physical assaults at the hands of intimate partners than do men. The survey found that women who were physically assaulted by an intimate partner averaged 6.9 physical assaults by the same partner, but men averaged 4.4 assaults. The survey also found that 41.5 percent of the women who were physically assaulted by an intimate partner were injured during their most recent assault, compared with 19.9 percent of the men. These findings suggest that research aimed at understanding and preventing intimate partner violence against women should be stressed.

- Women living with female intimate partners experience less intimate partner violence than women living with male intimate partners. Slightly more than 11 percent of the women who had lived with a woman as part of a couple reported being raped, physically assaulted, and/or stalked by a female cohabitant, but 30.4 percent of the women who had married or lived with a man as part of a couple reported such violence by a husband or male cohabitant. These findings suggest that lesbian couples experience less intimate partner violence than do heterosexual couples; however, more research is needed to support or refute this conclusion.

- Men living with male intimate partners experience more intimate partner violence than do men who live with female intimate partners. Approximately 15 percent of the men who had lived with a man as a couple reported

# Defining Intimate Partner Violence

There is currently little consensus among researchers on exactly how to define the term "intimate partner violence."[1] As a result, definitions of the term vary widely from study to study, making comparisons difficult. One source of controversy revolves around whether to limit the definition of the term to acts carried out with the intention of, or perceived intention of, causing physical pain or injury to another person. Although this approach presents a narrow definition of intimate partner violence that can be readily operationalized, it ignores the myriad behaviors that persons may use to control, intimidate, and otherwise dominate another person in the context of an intimate relationship. These behaviors may include acts such as verbal abuse, imprisonment, humiliation, stalking, and denial of access to financial resources, shelter, or services.

Another source of controversy revolves around whether to limit the definition of the term to violence occurring between persons who are married or living together as a couple or to include persons who are dating or who consider themselves a couple but live in separate domiciles. At present the research literature is bifurcated, with some studies focusing on violence occurring in marital or heterosexual cohabiting relationships and others focusing on violence occurring in heterosexual dating relationships. Only a handful of studies examine violence in same-sex cohabiting or dating relationships.

The definition of intimate partner violence used in the NVAW Survey includes rape, physical assault, and stalking perpetrated by current and former dates, spouses, and cohabiting partners, with cohabiting meaning living together at least some of the time as a couple. Both same-sex and opposite-sex cohabitants are included in the definition. The survey's definition of intimate partner violence resembles the one developed by CDC[2] because it includes violence occurring between persons who have a current or former dating, marital, or cohabiting relationship and same-sex and opposite-sex cohabitants. However, it deviates from CDC's definition because it includes stalking as well as rape and physical assault.

For purposes of the survey, "rape" is defined as an event that occurs without the victim's consent and involves the use of threat or force to penetrate the victim's vagina or anus by penis, tongue, fingers, or object or the victim's mouth by penis. The definition includes both attempted and completed rape. "Physical assault" is defined as behaviors that threaten, attempt, or actually inflict physical harm. The definition includes a wide range of behaviors, from slapping, pushing, and shoving to using a gun. "Stalking" is defined as a course of conduct directed at a specific person involving repeated visual or physical proximity; nonconsensual communication; verbal, written, or implied threats; or a combination thereof that would cause fear in a reasonable person, with "repeated" meaning on two or more occasions. The definition of stalking used in the survey does not require stalkers to make a credible threat against victims, but it does require victims to feel a high level of fear. The specific questions used to screen respondents for rape, physical assault, and stalking victimization are behaviorally specific and are designed to leave little doubt in the respondent's mind as to what is being measured (see sidebar, "Survey Screening Questions").

6

## Survey Screening Questions

**Rape:** Five questions were used to screen respondents for completed and attempted rape victimization:[a]

- [Female respondents only] *Has a man or boy ever made you have sex by using force or threatening to harm you or someone close to you? Just so there is no mistake, by sex we mean putting his penis in your vagina.*

- *Has anyone, male or female, ever made you have oral sex by using force or threat of force? Just so there is no mistake, by oral sex we mean that a man or boy put his penis in your mouth or someone, male or female, penetrated your vagina or anus with their mouth.*

- *Has anyone ever made you have anal sex by using force or threat of force? Just so there is no mistake, by anal sex we mean that a man or boy put his penis in your anus.*

- *Has anyone, male or female, ever put fingers or objects in your vagina or anus against your will or by using force or threats?*

- *Has anyone, male or female, ever attempted to make you have vaginal, oral, or anal sex against your will but intercourse or penetration did not occur?*

**Physical assault:** A modified version of the original Conflict Tactics Scale was used to screen respondents for physical assault they experienced as an adult at the hands of another adult:[b]

- *Not counting any incidents you have already mentioned, after you became an adult, did any other adult, male or female, ever:*

  - *Throw something at you that could hurt?*
  - *Push, grab, or shove you?*

  - *Pull your hair?*
  - *Slap or hit you?*
  - *Kick or bite you?*
  - *Choke or attempt to drown you?*
  - *Hit you with some object?*
  - *Beat you up?*
  - *Threaten you with a gun?*
  - *Threaten you with a knife or other weapon?*
  - *Use a gun on you?*
  - *Use a knife or other weapon on you?*

**Stalking:** The following questions were used to screen respondents for stalking victimization:

- *Not including bill collectors, telephone solicitors, or other salespeople, has anyone, male or female, ever:*

  - *Followed or spied on you?*
  - *Sent you unsolicited letters or written correspondence?*
  - *Made unsolicited phone calls to you?*
  - *Stood outside your home, school, or workplace?*
  - *Showed up at places you were even though he or she had no business being there?*
  - *Left unwanted items for you to find?*
  - *Tried to communicate in other ways against your will?*
  - *Vandalized your property or destroyed something you loved?*

Respondents who answered *yes* to one or more of these questions were asked whether anyone had ever done any of these things on

more than one occasion and whether they felt frightened or feared bodily harm as a result of these behaviors. Only respondents who reported being victimized on more than one occasion and who were very frightened or feared bodily harm were counted as stalking victims.

**Victim-perpetrator relationship:** Respondents who answered affirmatively to the rape, physical assault, and/or stalking screening questions were asked whether their attacker was a current or ex-spouse, a male live-in partner, a female live-in partner, a relative, someone else they knew, or a stranger. Respondents disclosing victimization by an ex-spouse or cohabiting partner were asked to further identify which spouse/partner victimized them (e.g., first ex-husband, current male live-in partner). Respondents disclosing victimization by a relative were asked to further

specify which relative victimized them (e.g., father, brother, uncle, cousin). Finally, respondents disclosing victimization by someone else they knew were asked to further specify the relationship they had with this person (e.g., date, boss, teacher, neighbor). Only victimizations perpetrated by current and former spouses, same-sex and opposite-sex cohabiting partners, and dates are included in the analyses discussed in this report.

a. Rape screening questions were adapted from those used in The National Women's Study, *Rape in America: A Report to the Nation,* National Victim Center and the Crime Victims Research and Treatment Center, Arlington, Virginia, April 23, 1992: 15.

b. Straus, M., "Measuring Intrafamily Conflict and Violence: The Conflict Tactics (CT) Scale," *Journal of Marriage and the Family* 41 (1979): 75-88.

## Notes

1. National Research Council, *Understanding Violence Against Women,* Washington, D.C.: National Academy Press, 1996: 9–10.

2. Saltzman, L.E., J.L. Fanslow, P.M. McMahon, and G.A. Shelley, *Intimate Partner Violence Surveillance: Uniform Definitions and Recommended Data Elements,* Atlanta: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, 1999.

# Risk Factors Associated With Intimate Partner Violence

Risk factors are characteristics associated with an increased likelihood that a problem behavior will occur. It is important to note that the presence of a risk factor does not mean that the behavior will necessarily occur, only that the odds of it occurring are greater.

Numerous studies have examined risk factors associated with intimate partner violence. Results from these studies show that unmarried, cohabiting couples have higher rates of intimate partner violence than do married couples[1]; minorities have higher rates of intimate partner violence than do whites (see note 5 in "Introduction"); lower income women have higher rates of intimate partner violence than do higher income women[2]; less educated women have higher rates of intimate partner violence than do more educated women[3]; and couples with income, educational, or occupational status disparities have higher rates of intimate partner violence than do couples with no status disparity.[4] Research also shows that experiencing and/or witnessing violence in one's family of origin increases one's chances of being a perpetrator or victim of intimate partner violence.[5] In addition, research shows that wife assault is more common in families where power is concentrated in the hands of the husband or male partner and the husband makes most of the decisions regarding family finances and strictly controls when and where his wife or female partner goes.[6] Finally, research suggests that persons with a disability are at greater risk of violence,[7] although there is no empirical evidence that having a disability increases one's risk of intimate partner violence.

To increase understanding of risk factors associated with intimate partner violence, logistic regressions were conducted using a backward stepwise procedure on respondents married or cohabiting with a partner at the time of the interview to determine what characteristics of the relationship, respondent, or partner differentiated those who reported being victimized by their current partner from those who did not. Separate analyses were conducted for women ($n = 4,896$) and men ($n = 5,056$).

In each of the logistic regressions, the dependent variable was whether the respondent reported being raped, physically assaulted, or stalked by his or her current spouse or cohabiting partner. The independent variables were as follows:

- Whether the respondent was cohabiting versus married.

- Whether the respondent was white, African-American, American Indian/Alaska Native, Asian/Pacific Islander, or mixed race.

- Whether the respondent was Hispanic.

- Whether the respondent's race and/or Hispanic origin was different from the partner's.

- Whether the respondent's education level was a high school diploma or less.

- Whether the respondent's education level was higher than the partner's.

- Whether the respondent was physically assaulted as a child by an adult caretaker.

- Whether the partner was jealous or possessive.

- Whether the partner denied the respondent access to family, friends, or family income.

- Whether the partner called the respondent names or shouted or swore at the respondent in front of other people.

- Whether the respondent was physically disabled when the relationship started.

34

The logistic regressions were designed to provide a measure by which the relative importance of the independent variables could be assessed and to determine which variables increased the odds that a woman or man would be victimized by an intimate partner. Income variables were not included in the analyses because of the large number of respondents who refused to provide information about their or their partner's income.

The results of the logistic regression reveal a strong link between child maltreatment and subsequent victimization by an intimate partner. Women and men who were physically assaulted as children by adult caretakers were significantly more likely to report being victimized by their current partner, even when the effects of other independent variables were controlled (see tables I and II in sidebar, "Results of the Logistic Regressions"). It is possible that persons victimized as children by adult caretakers were more tolerant of persons who engaged in violent and threatening behaviors as adults and, therefore, more likely to get involved with abusive partners. However, it is also possible that respondents who reported one type of victimization (e.g., child maltreatment) were simply more willing to report other types of victimization (e.g., intimate partner violence). Clearly, more research is recommended on the possible link between childhood victimization and intimate partner victimization.

Results of the logistic regression for women, but not men, support previous research that shows unmarried couples are at greater risk of intimate partner violence than married couples, and African-American couples are at greater risk than white couples. They also show a strong link between violence and emotionally abusive and controlling behavior in intimate relationships. Indeed, having a verbally abusive partner was associated with the largest change in the odds that a woman would be victimized by an intimate partner (see table I in sidebar, "Results of the Logistic Regressions"). These findings support the theory that much of the

violence perpetrated against women by male partners is part of a systematic pattern of dominance and control, or what some researchers have called "patriarchal terrorism. "[8]

Results of the logistic regressions for both women and men support the theory that couples with status disparities experience more intimate partner violence than do couples with no status disparities. Women were significantly more likely to report violence by a current partner if their education level was greater than their partner's, and men were significantly more likely to report being victimized by their current partner if their race and/or Hispanic origin was different from their partner's (see tables I and II in sidebar, "Results of the Logistic Regressions").

## Notes

1. Yllo, K., and M. Straus, "Interpersonal Violence Among Married and Cohabiting Couples," *Family Relations* 30 (1981): 339–347; Stets, J.E., and M.A. Straus, "The Marriage License as a Hitting License: A Comparison of Assaults in Dating, Cohabiting, and Married Couples," *Journal of Family Violence* 4 (2) (1989): 161–180; Ellis, L., *Theories of Rape: Inquiries Into the Causes of Sexual Aggression.* New York: Hemisphere Books, 1989.

2. Bachman, R., *Violence Against Women: A National Crime Victimization Survey Report,* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1994, NCJ 145325; Bachman, R., and L.E. Saltzman, *Violence Against Women: Estimates From the Redesigned Survey,* Special Report, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1995, NCJ 154348; *Behind Closed Doors,* eds. Straus, M.A., R.J. Gelles, and S. Steinmetz, Newbury Park, California: Sage Publications, 1980; Zawit, M.W., *Violence Between Intimates,* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1994, NCJ 149259.

3. *Ibid.,* Bachman and Saltzman; *ibid.,* Zawit; Hornung, C.A., B.C. McCullough, and T. Sugimoto, "Status Relationships in Marriage, Risk Factors in Spouse Abuse," *Journal of Marriage and the Family* 43 (1981): 675–692.

## Results of the Logistic Regressions

### I. Best Model of the Relationship Between Independent Variables and Risk of Intimate Partner Violence for Women

| Variable | B | S.E. | Exp(b) | p-value |
|---|---|---|---|---|
| Respondent was cohabiting | 0.5562 | 0.24 | 1.7441 | 0.018 |
| Respondent was white | −0.4171 | 0.17 | 0.6590 | 0.021 |
| Respondent was African-American | 0.2988 | 0.24 | 1.3483 | 0.014 |
| Respondent was Asian/Pacific Islander | −0.2048 | 0.40 | 0.8148 | 0.208 |
| Respondent was American Indian/Alaska Native | 0.3854 | 0.43 | 1.4702 | 0.609 |
| Respondent's education level was higher than partner's | 0.3400 | 0.14 | 1.4049 | 0.019 |
| Respondent was physically assaulted as a child by a caretaker | 0.9546 | 0.14 | 2.5976 | 0.000 |
| Partner was jealous or possessive | 0.9597 | 0.16 | 2.6109 | 0.000 |
| Partner was denied access to family, friends, or income | 0.4466 | 0.21 | 1.5630 | 0.031 |
| Partner was verbally abusive | 2.0324 | 0.15 | 7.6325 | 0.000 |
| Constant | −4.4202 | 0.30 | | |

### II. Best Model of the Relationship Between Independent Variables and Risk of Intimate Partner Violence for Men

| Variable | B | S.E. | Exp(b) | p-value |
|---|---|---|---|---|
| Respondent was cohabiting | −0.4307 | 0.25 | 0.6501 | 0.085 |
| Respondent's race/Hispanic origin was different from partner's | 0.6697 | 0.22 | 1.9537 | 0.002 |
| Respondent was physically assaulted as a child by a caretaker | 1.1356 | 0.21 | 3.1131 | 0.000 |
| Constant | −4.0239 | 0.29 | | |

### III. Best Model of the Relationship Between Independent Variables and Risk of Injury for Female Intimate Partner Rape Victims*

| Variable | B | S.E. | Exp(b) | p-value |
|---|---|---|---|---|
| Victim was Hispanic | 1.4219 | 0.66 | 4.1449 | 0.031 |
| Victim was 18–25 years old | 0.7486 | 0.41 | 2.1140 | 0.070 |
| Perpetrator threatened to harm or kill | 1.2620 | 0.26 | 3.5324 | 0.000 |
| Perpetrator used a weapon | 0.9467 | 0.50 | 2.5773 | 0.057 |
| Perpetrator was using drugs or alcohol | 0.4395 | 0.27 | 1.5519 | 0.010 |
| Perpetrator was a spouse | 0.5286 | 0.26 | 1.6966 | 0.041 |
| Perpetrator was a cohabiting partner | −0.7862 | 0.20 | 0.4556 | 0.000 |
| Constant | −1.3332 | 0.26 | | |

(continued)

36

| (continued) | | | | |
|---|---|---|---|---|
| **IV. Best Model of the Relationship Between Independent Variables and Risk of Injury for Female Victims of Intimate Partner Physical Assault**[a] | | | | |
| Variable | *B* | S.E. | Exp(*b*) | *p*-value |
| Perpetrator threatened to harm or kill | 0.9683 | 0.13 | 2.6335 | 0.000 |
| Perpetrator was using drugs or alcohol | 0.5225 | 0.12 | 1.6863 | 0.000 |
| Constant | −9.749 | 0.10 | | |
| **V. Best Model of the Relationship Between Independent Variables and Risk of Injury for Male Victims of Intimate Partner Physical Assault**[a] | | | | |
| Variable | *B* | S.E. | Exp(*b*) | *p*-value |
| Perpetrator threatened to harm or kill | 0.7987 | 0.28 | 2.2226 | 0.005 |
| Perpetrator used a weapon | 0.6341 | 0.31 | 1.8865 | 0.0438 |
| Constant | −1.7944 | 0.15 | | |

*Note: Several statistics are presented in tables I–V. The logistic coefficients (B) and their standard errors (S.E.) can be interpreted as the change associated with a unit change in the explanatory variable when all other variables in the model are held constant. The regression coefficients can be more easily understood if quoted as an odds ratio. The odds ratio [Exp(b)] provides the ratio of the odds of the p (the probability of an event happening) in the group responding yes to the explanatory variable relative to the group responding no to the explanatory variable while all other variables are held constant. For example, an odds ratio of 1 indicates changes in the explanatory variable do not lead to changes in the odds of p; a ratio of less than 1 indicates the odds of p decrease as x increases; and a ratio of greater than 1 indicates the odds of p increase as x increases. Variables are considered significant if they have a p value of 0.05.*

[a] *These findings are discussed in "Rate of Injury Among Victims of Intimate Partner Rape and Physical Assault."*

4. Ibid., Hornung, McCullough, and Sugimoto.

5. Hotaling, G.T., and D.B. Sugarman, "An Analysis of Risk Markers in Husband-to-Wife Violence," *Journal of Family Violence 5* (1990): 1–13; Kaufman, K.G., J.L. Jasinski, and E. Aldarondo, "Sociocultural Status and Incidence of Marital Violence in Hispanic Families," *Violence and Victims* 9 (3) (1994): 207–222.

6. Frieze, I., and A. Browne, "Violence in Marriage," in *Family Violence*, eds. L. Ohlin and M. Tonry, Chicago: University of Chicago Press, 1989: 163–218; Levinson, D., *Violence in Cross-Cultural Perspective*, Newbury Park, California: Sage Publications, 1989.

7. Sobsey, D., *Violence and Abuse in the Lives of People With Disabilities: The End of Silent Acceptance?* Baltimore: Paul H. Brookes Publishing Company, 1994; Sobsey, D., and C. Varnhagen, "Sexual Abuse, Assault, and Exploitation of Individuals With Disabilities," *Child Sexual Abuse: Critical Perspectives on Prevention, Intervention, and Treatment*, eds. C. Gagley and R.J. Thomlinson, Toronto: Wall and Emerson, 1991: 203–216.

8. Johnson, M.P., "Patriarchal Terrorism and Common Couple Violence: Two Forms of Violence Against Women," *Journal of Marriage and the Family 57* (1995): 283–294.

# Point in Relationship When Violence Occurs

It is a common belief that the termination of a relationship poses an increased risk for, or escalation of, intimate partner violence. This assumption is based on two types of evidence: Divorced or separated women report more intimate partner violence than do married women.[1] Also, interviews with men who have killed their wives indicate that either threats of separation by their partner or actual separation are most often the precipitating events that lead to the murder.[2]

The NVAW Survey found that married women who lived apart from their husbands were nearly four times more likely to report that their husbands had raped, physically assaulted, and/or stalked them than were women who lived with their husbands (20 percent and 5.4 percent). Similarly, married men who lived apart from their wives were nearly three times more likely to report that their wives had victimized them than were men who lived with their wives (7.0 percent and 2.4 percent). These findings suggest

that termination of a relationship poses an increased risk of intimate partner violence for both women and men. However, it should be noted that the survey data do not indicate whether the violence happened before, after, or at the time the couple separated. Thus, it is unclear whether the separation triggered the violence or the violence triggered the separation.

To test the assumption that the termination of a relationship leads to an increased risk of intimate partner violence, the NVAW Survey asked women victimized by a former spouse or cohabiting partner whether their victimization occurred before, after, or both before and after the relationship ended. Only 6.3 percent of the rape victims and 4.2 percent of the physical assault victims said their victimization started after the relationship ended (exhibit 10). These findings suggest most rapes and physical assaults perpetrated against women by intimates occur in the context of an ongoing rather than terminated



**Exhibit 10. Distribution of Female Victims of Intimate Partner Rape, Physical Assault, and Stalking, by Point in Relationship When the Violence Occurred**

Rape victims
(*n* = 288)

Physical assault victims
(*n* = 1,061)

Stalking victims
(*n* = 263)

6.3%          4.2%

■ Before relationship ended     ▓ After relationship ended

■ Both before and after relationship ended

Note: Estimates are based on responses from women who were victimized by a former spouse or cohabiting partner since age 18.

38

relationship. In comparison, 42.8 percent of the stalking victims said their victimization started after the relationship ended. Thus, stalking is more likely to occur in the context of a terminated relationship than is rape or physical assault.

It is not possible to ascertain from the data whether violence occurring before the relationship ended was linked to threats about leaving the relationship. It is also unclear whether women who said they were victimized before and after the relationship ended experienced more severe violence at the time of separation. Finally, it is important to note that when a relationship ends is a matter of interpretation rather than objective reality. Some women may have equated the end of the relationship with when they or their partner first started talking about leaving the relationship, whereas others may have equated it with the formal dissolution of a marriage. Clearly, more research is needed on how terminating a relationship increases the risk of intimate partner violence for women and men.

## Notes

1. Klaus, P., and M. Rand, *Family Violence*, Special Report, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1984, NCJ 093449; Stark, E., and A. Flitcraft, "Violence Among Intimates: An Epidemiological Review," in *Handbook of Family Violence*, ed. V.B. Van Hasselt, New York: Plenum Press, 1988: 307–308; Zawit, M.W., *Violence Between Intimates*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1994, NCJ 149259.

2. Bernard, M.L., and J.L. Bernard, "Violent Intimacy: The Family as a Model for Love Relationships," *Family Relations* 32 (1983): 283–286; Daly, M., and M. Wilson, "Evolutionary Social Psychology and Family Homicide," *Science* 242 (1988): 519–524.

**TAB B**

Harvard Vanguard Medical Associates    6/22/2005
*BUNDU,FRANCOISE 2461646 (Cont'd)*
  TRAZODONE HCL TABLET 50MG PO          30     0          5/18/2005  5/18/2005
    Class: External
    Sig: 1 tablet at bedtime as needed for sleep
    Order#: 104148023


  Level of Service: EST. PAT. L3, OFFICE VISIT [99213]

  Encounter Closed By: PENNOYER MD, HILDRED (HILDY) On 5/18/2005


| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 2/11/2004 | BECK, ALEXANDRA LICSW | KENCASEM | KEN |

  Progress Notes:
    VM mess recd from last eve:
    pt called from Belgium-- left US w/ mo and twins babies Jan 17 w/ court permission.
    OK now-- resting, thinking. Has INS prob due to husb-- will fight for gn card on
    own.
    Will pursue divorce, hopes to return to US in a few months.
    Expressed gratitude to soc wkr.



  Encounter Closed By: BECK LICSW, ALEXANDRA R. On 2/11/2004


| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 1/15/2004 | BECK, ALEXANDRA LICSW | KENCASEM | KEN |

  Progress Notes:
    f/u call 4:25 PM:
    retd to court and judge gave her ok to leave country with babies BUT
    judge granted husb visitation rights too --problem at house yest--
    could not stay on phone with me--apparently packing up--"we have to go".
    States she will get back to me or Biddy when she can. I enc her to continue to do
    what is necessary to stay safe, call police as needed.



  Encounter Closed By: BECK LICSW, ALEXANDRA R. On 1/15/2004


| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 1/9/2004 | BECK, ALEXANDRA LICSW | KENCASEM | KEN |

  Progress Notes:
    f/u call to pt. I will call agn next wk.



  Encounter Closed By: BECK LICSW, ALEXANDRA R. On 1/9/2004


| Date | Provider | Department | Center |
|------|----------|------------|--------|

**TAB C**

Printed on 07/29/2003 09:41 AM

Harvard Vanguard Medical Associates    6/22/2005
BUNDU, FRANCOISE 2461646 (Cont'd)
   Encounter Closed By: RANKINS-SWIRE RN, BELINDA On 6/27/2000


| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 6/21/2000 | KETEMA, AMSALE MD | KENIM6E | KEN |

Visit Diagnosis:
6/21/2000   *ABDOMINAL PAIN                      789.00
Visit Diagnosis Changes:
Added     789.00 by KETEMA MD, AMSALE (8671), Wed Jun 21, 2000 11:31 AM


Reason for visit:
   LOW BACK PAIN [317]  Cmt: SIDE PAIN ALSO, UNABLE TO URINATE MORE THAN ONCE A
                             DAY.


Vitals:  BP 120/80 | Temp 97.1


Questionnaires: URINE DIPSTICK (OFFICE TEST)
LEUKOCYTES NEG
NITRITE  NEG
UROBILINOGEN 0.2
PROTEIN  TRACE
PH 6.0
URINE BLOOD MODERATE
KETONE  NEG
BILIRUBIN NEG
GLUCOSE  NEG


Progress Notes:
   See Dictation.


Transcription:
Visit Note                  ID: 4VAQ8J2B2I      6/21/2000    10:41 AM
Author: KETEMA, AMSALE MD
Authenticated by KETEMA, AMSALE MD Medical Doctor on 6/21/2000 at 10:41 AM
Document text:
HISTORY:  Bilateral Back and Abdominal Discomfort
The patient is a 32 year old who presents with a chief complaint of bilateral back
and abdominal discomfort of three weeks duration.  Associated with this, she has
noticed that she is not urinating as much and is only able to urinate a small amount
relative to her usual amount.  Denies dysuria, frequency, fever, chills, nausea,
vomiting, diarrhea, paresthesias. She does not recall any musculoskeletal injury.
Her last menstrual period was on 6/2/00.  She is followed by Infertility and is
hoping to get pregnant.  Her menses have been regular.  Her last bowel movement was
approximately one week ago, and she reports this is usual for her.  Denies family
history or nephrolithiasis and colon cancer. Also reports her appetite is down. She
has recently been going through some marital problems.  Pain does not wake her up in
the middle of the night, but has episodes of exacerbation. The remaining review of
systems are negative.
On exam, she is no apparent distress.  Temperature is 97.1. Cardiac is regular rate
and rhythm.  Abdomen is soft, nontender, nondistended with normal, active bowel
sounds.  There is no organomegaly.  There was no CVA tenderness.  Her discomfort is
described as being below the costovertebral angle and deep.  It was not reproduced
by physical exam.
Extremities without cyanosis or edema.
Urine dip revealed moderate blood, trace protein but no white cells.
IMPRESSION:  Abdominal and back discomfort.  She also has some vague complaints of
decreased appetite and decreased extent of urination.  Her urine does not look
infected.  Will send urine culture as well as check urine pregnancy test.  Given the
finding of microscopic hematuria, I have also proceeded to obtain CT of the abdomen
and pelvic to rule out nephrolithiasis.  She will follow-up p.r.n.


Harvard Vanguard Medical Associates    6/22/2005

**TAB D**

Encounter Closed By: BECK LICSW, ALEXANDRA R. On 12/4/2003

| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 12/2/2003 | BECK, ALEXANDRA LICSW | KENCASEM | KEN |

Visit Diagnosis:
| 12/2/2003 | *POSTPARTUM FOLLOW-UP | V24.2 |
|---|---|---|

Visit Diagnosis Changes:
Added   V24.2 by BECK LICSW, ALEXANDRA R. (3877), Tue Dec 2, 2003 11:53 AM

Progress Notes:
   Refl to med soc wk by Biddy Fein midwife re issues of personal safey. Pt is 3 wks
   pp w/ twins.
   P/C TO FRANCOISE:
   relates long hx of very controlling behavior with verbal and physical abuse by
   husb, today feels unsafe for herself and 2 babies. She would like to remove him
   from home.  He works in Bos.
   Her mother is visiting from Zaire, speaks only French .
   I reviewed some basic safety measures incl making Camb police aware of her
   situation.
   Resource is shared for dv/legal advice.
   Request c/b to myself or Biddy later in afternoon re her plan.


Encounter Closed By: BECK LICSW, ALEXANDRA R. On 12/2/2003

Incoming Call
| Date | Time | Provider | Department | Center |
|------|------|----------|------------|--------|
| 12/2/03 | 10:50 AM | FEIN, ELIZABETH CNM[F559] | KENOBG | KEN |

Initial Contact
| When | Type | Contact |
|------|------|---------|
| 12/2/03 10:50 AM | Incoming | |

Message:
   >> ELIZABETH FEIN CNM Tue Dec 2, 2003 10:54 AM
   >> CALL RECEIVED. Contact:
   tc from patient expressing concerns about her safety at home. Consult with
   Alex Beck and patient will be contacted. Requests contact before 5pm.


Encounter Closed By: FEIN CNM, ELIZABETH On 12/2/2003

| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 11/17/2003 | DOWLING, DOROTHY E MD | KENOBG | KEN |

Visit Diagnosis:
| 11/17/2003 | *POSTPARTUM FOLLOW-UP | V24.2 |
|---|---|---|

**TAB E**

Harvard Vanguard Medical Associates    6/22/2005
*BUNDU,FRANCOISE 2461646 (Cont'd)*

| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 12/15/2003 | FEIN, ELIZABETH CNM | KENOBG | KEN |

| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 12/10/2003 | BECK, ALEXANDRA LICSW | KENCASEM | KEN |

Progress Notes:
    With ok from patient, I have referred her into a Camb home-visiting prog for new
    moms and babies-- Early Intervention Partnerships 617-629-3919. Kathryn Killoran
    Rn will contact pt and set up appt to visit her and twins.
    I also gave pt # for Camb WIC 617-591-6900.

Chart Reviewed By:                On:
FEIN CNM, ELIZABETH [5631]        Wed Dec 10, 2003  3:06 PM EDT
BECK LICSW, ALEXANDRA R. [3877]   Fri Dec 26, 2003  3:14 PM EDT
BECK LICSW, ALEXANDRA R. [3877]   Mon Dec 29, 2003 11:23 AM EDT

Encounter Closed By: BECK LICSW, ALEXANDRA R. On 12/10/2003

| Date | Provider | Department | Center |
|------|----------|------------|--------|
| 12/8/2003 | FEIN, ELIZABETH CNM | KENOBG | KEN |

Visit Diagnosis:
12/8/2003    *POSTPARTUM FOLLOW-UP          V24.2
12/8/2003    FAMILY PLANNING ADVICE         V25.09
Visit Diagnosis Changes:
Added  V25.09 by FEIN CNM, ELIZABETH (5631), Mon Dec 8, 2003 2:27 PM
Primary Diagnosis changed from V25.09 to V24.2 by FEIN CNM, ELIZABETH (5631),
Mon Dec 8, 2003  2:39 PM
Primary Diagnosis changed from V25.09 to V24.2 by FEIN CNM, ELIZABETH (5631),
Mon Dec 8, 2003  2:39 PM

Reason for visit:
    POSTPARTUM CHECK [391]

Vitals: BP 140/90 | Ht 5'4" | Wt 164 lbs

December 26, 2003

Francoise Bundu
402 Rindge
Ave
#10h
Cambridge, MA 02238

Harvard Vanguard Medical Associates    6/22/2005

FB 115

Harvard Vanguard Medical Associates    6/22/2005
BUNDU,FRANCOISE 2461646 (Cont'd)

Dear Ms. Bundu:

Thank you for your
recent visit to my office. I am pleased to report that your Pap smear was
normal. Your next Pap smear should be scheduled for 1 year from your
last.

If you have any questions or concerns, please call me at 617-421-1191.
Otherwise, I look forward to seeing you at your next exam.


Sinc
erely,


Elizabeth Fein, CNM/md
Harvard Vanguard Medical
Associates
Kenmore Practice
133 Brookline Avenue
Boston, MA 02215-2523


Progress Notes:
    36 yrs.  G1 P1   here for postpartum visit at 6 weeks.
    Delivery Information: Primary C/ Section
    Obstetric History
    G1  P1    T0  P0  TAB0  SAB0  E0  M2  L2

    Date:            10/30/2003
    Gestational Age: 39w
    Delivery Type:   P C/S
    Infant Gender:   Female
    Birth Weight:    6 lbs 13 oz
    Anesthesia:      Spinal
    Comments:        breech

    Date:            10/30/2003
    Gestational Age: 39w
    Delivery Type:   P C/S
    Infant Gender:   Male
    Birth Weight:    5 lbs 13 oz
    Anesthesia:      Spinal
    Comments:        breech

    Antepartum/intrapartum/postpartum complications: pregnancy complicated by preterm
    labor, at home on bedrest until 35 weeks. Breech presentation with primary c/s
    10/30 at 39 weeks. PP course complicated by issues of domestic violence reported
    to me and f/u with Alex Beck and with Cambridge hotline. Has restraining order and
    plans to go to court soon.

    Feeding method: breast and bottle and feeds q 3 hours. Bottles at night and mother
    is staying with her and does the night feedings. Francoise is nursing well all day
    and no nipple soreness noted.

    SYMPTOMS:
    Lochia: none and stopped at 4-5 weeks
    Coitus: not yet
    Elimination: voiding well, BMs regular and hemorrhoids not a problem

FB 116

Harvard Vanguard Medical Associates    6/22/2005
*BUNDU, FRANCOISE 2461646 (Cont'd)*
    Incisional/perineal discomfort: minimal
    Postpartum adjustment: limited supports and concerned about the future. May consider returning to Africa with Mom if feasible or else will have to find day care and return to work. Has restraining order now and knows what to do if she or the children are in danger.Lawyer is coming to her home to help her. Describes verbal and physical abuse that prompted her call to the police for a restraining order.

    EXAM:
    Thyroid: normal
    Breasts: lactating
    Abdomen: soft, non-tender and well healed Pfannenstiel
    Extremities: normal and no edema
    Pelvic:
        Vulva: normal and Bartholin's, Urethra, Skene's normal;
        Vagina: normal mucosa, normal discharge and pap obtained;
        Cervix: no lesions and no cervical motion tenderness;
        Uterus: well involuted, anteverted, mobile and non-tender;
        Adnexa: not palpable;
        Rectum: deferred

    ASSESSMENT: normal 4-8 week postpartum course and limited home supports
        Edinburgh Postpartum Depression score:normal
    PLAN:
    Birth control: no plans for consensual sex. Given rx for Plan B in the event of an emergency and advised to call immediately if exposed to any risk of infection or pregnancy.
    Pap done.
    Referral to BH not done
    F/U for pregnancy or delivery complications: review sx of mastitis and of pp depression and resources of when and how to call.
    rv 1yr or as needed
    F/U with PCP in 3-6 months to reeval BP
    Call anytime if she needs help.


Coll: 12/8/2003  2:39 PM  Ord# 95495217          FEIN, ELIZABETH CNM
PAP SMEAR


Coll: 12/8/2003 12:02 PM  Ord# 95749825 G03066773      FEIN, ELIZABETH CNM
GYNECOLOGIC CYTOLOGY PAP SMEAR

| | Value | Flag | Low | High | Units |
|---|---|---|---|---|---|
| OB/PED GYNECOLOGIC PAP* | * | | | | |
| OB/PED GYNECOLOGIC PAP* | | * | | | |
| OB/PED GYNECOLOGIC PAP* | PAP SMEAR * | | | | |
| OB/PED GYNECOLOGIC PAP* | Statement * | | | | |
| OB/PED GYNECOLOGIC PAP* | SOURCE: | | | | |
| OB/PED GYNECOLOGIC PAP* | Exo/endoce* | | | | |
| OB/PED GYNECOLOGIC PAP* | CLINICAL H* | | | | |
| OB/PED GYNECOLOGIC PAP* | IMP: | * | | | |
| OB/PED GYNECOLOGIC PAP* | RECOMMENDE* | | | | |
| OB/PED GYNECOLOGIC PAP* | If absent * | | | | |
| OB/PED GYNECOLOGIC PAP* | previous P* | | | | |
| OB/PED GYNECOLOGIC PAP* | If partly * | | | | |
| OB/PED GYNECOLOGIC PAP* | months. | | | | |
| OB/PED GYNECOLOGIC PAP* | CLINICAL R* | | | | |
| OB/PED GYNECOLOGIC PAP* | CODE 0: Re* | | | | |
| OB/PED GYNECOLOGIC PAP* | RLS/RLS * | | | | |
| OB/PED GYNECOLOGIC PAP* | * | | | | |

FB 117

**TAB 5**

# BINGHAM McCUTCHEN

Andrew C. Phelan
Direct Phone: (617) 951-8603
E-Mail: andrew.phelan@bingham.com

October 17, 2006

*Via Facsimile (617) 748-3664*

AUSA Donald L. Cabell, Esq.
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:  *United States v. Francoise Bundu, Case No. 1:05-mj-01076-JGD-ALL*

Dear Mr. Cabell:

I write this letter in order to call to your attention the pressing need to bring the above-captioned case to resolution. Its continuing pendency causes ongoing anxiety and difficulties for Francoise Bundu as she tries to continue to move forward in her life and provide for her three-year-old twins, Maya and Betoya.

As you are aware, the divorce proceedings ended several months ago and the Middlesex County Probate and Family Court granted Francoise joint custody of the children along with ████████. The child support payments he makes are very low and, at times, erratic. They are not enough for her to provide adequately for her children, much less for herself. She continues to be alone, isolated, and strained, particularly when it comes to her finances. She has made efforts to find work and has recently started to work in a customer service job, which pays only $9 per hour. The fact that she is currently under Court supervision and potential felony charges has made it difficult for her to seek work commensurate with her education for fear of being rejected due to the pending charges and losing a realistic opportunity to get such a job when this matter is resolved. She previously worked as an accountant for a major firm (Morgan Stanley) and would like to seek such work again once this matter is over.

This case has been pending for far too long. As you know, Francoise was arrested in April 2005 under a criminal complaint. She was jailed for about a month, under house arrest for about a month, and subject to 24-hour electronic monitoring by Pretrial Services for close to another year. In April 2006, her release conditions were modified to require that she check in with Pretrial Services twice per week. She has complied with all conditions imposed on her, which include weekly check-in visits to the Federal Courthouse. Francoise has now been under pretrial supervision and has had parental kidnapping charges hanging over her for more than eighteen months.

We very much appreciate your willingness in May to meet with us and to consider the facts we presented about this case and about the pattern of domestic violence that ██████████ subjected Francoise to during their marriage. Those facts showed that ██████ isolated Francoise from all support networks (friends, work, and family), abused

* H = Husband

Donald L. Cabell, Esq.
October 17, 2006
Page 2

her physically in a number of violent incidents (including when she was nine months pregnant), abused her emotionally, sought repeatedly to control and intimidate her, and sought to manipulate her immigration status to his advantage. In our view, and as we discussed at length in our June 1 letter, all these facts present a strong affirmative defense to a charge of parental kidnapping in that Francoise fled and sought to avoid a situation that was beyond her ability to control: ████████'s pattern of domestic violence.

The purpose of this letter, however, is not to rehash the merits of Francoise's affirmative defense, which we already presented in our earlier letter. Rather, it is to renew our request that you bring this case to an end so that Francoise can get on with her life without having the constant anguish of a potential criminal indictment shadowing her every action and preventing her from moving forward. Our expectation when we met in May and submitted the letter on June 1 was that this matter would get resolved quickly. This has not happened, and I have called your office numerous times (perhaps too many times) over the months since then to determine the status of this matter and to do what I could to bring it to a conclusion.

We sincerely hope that you and the U.S. Attorney's Office make the decision to dismiss this case based on the merits of all that we have presented. In our view, that is the right thing to do, and it is in the interest of justice to do so. However, if your office is not inclined to do that in light of the information we have submitted, then indict the case so that at least Ms. Bundu can present her case to a jury and move on with her life. The status quo of the past nineteen months succeeds only in causing further emotional and economic prejudice to Francoise.

Don, again, we appreciate your careful consideration of this case. While for you and for me it may represent just another case on our busy plates, it is having very negative real-life impacts on a single mother who is struggling both emotionally and financially to build her life in this country. As I believe we told you, despite ████████ efforts when he revoked his support for her residency application, Francoise persevered and recently was successful in becoming a permanent resident of the United States. She is trying to rebuild her life and do her best to provide for and raise her young children. She cannot do that with this case hanging over her. Let's bring this unfortunate chapter of her life to a close so that she can continue with a more positive and more hopeful chapter as she moves forward with the rest of her life. Please contact me at your earliest convenience to discuss how we can do that. In the meantime, Ms. Bundu reserves all her rights under the law.

Sincerely,

Andrew C. Phelan

ACP/lal

Bingham McCutchen LLP
bingham.com